[No. E030210. Fourth Dist., Div. Two. May 29, 2002.]

APPLE VALLEY UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v.
VAVRINEK, TRINE, DAY & CO., LLP, et al., Defendants and Respondents.

## COUNSEL

Law Offices of Margaret A. Chidester & Associates, Margaret A. Chidester, Hector E. Salitrero and Carmen A. Brock for Plaintiff and Appellant.

Chapman, Glucksman & Dean, Randall J. Dean and Allen A. Mescobi for Defendants and Respondents.

## OPINION

**RICHLI, J.**—Apple Valley Unified School District (the District) sued Vavrinek, Trine, Day & Co., LLP (VTD) and Heidi Ross (collectively defendants) for accounting malpractice, claiming defendants' misrepresentations in an audit report induced the District to provide state funds to a charter school which was not entitled to the funds. The trial court sustained defendants' demurrer without leave to amend, based on the statute of limitations.

We conclude the statute began to run when the District learned of the improper payments and incurred expenses in an effort to assess and limit its exposure, notwithstanding the fact it had not been determined at that time—and still has not been determined—that the District is legally responsible for reimbursing the state for the funds. Since the District did not file suit until more than two years later, the trial court properly sustained the demurrer.

I

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Parties*

The District is a California public school district. VTD is a California accountancy partnership, and Ross is a member of VTD.

#### B. *Charter Schools*

The Charter Schools Act of 1992 (the Act) permits public school districts to grant charters for the operation of charter schools. (Ed. Code, § 47600 et

seq.)[1] Charter schools "are part of the Public School System," but "operate independently from the existing school district structure." (§§ 47615, subd. (a)(1), 47601.) They are intended, among other things, to "[e]ncourage the use of different and innovative teaching methods" and to provide "expanded choices in the types of educational opportunities that are available within the public school system." (§ 47601, subds. (c), (e).)

Charter schools are entitled to receive state and local funding based on average daily attendance (ADA) figures. (§ 47633, subd. (b).) However, the Act provides that charter schools must be nonsectarian in their programs and may not charge tuition. (§ 47605, subd. (d)(1).)

## C. Allegations of the Complaint

### 1. Cato I and II

In about November 1995, Snowline Joint Unified School District (Snowline), a California public school district, chartered Cato School of Reason I (Cato I). Education Foundation for Ethics and Principles (EFEP), a nonprofit public benefit corporation, was the parent of Cato I.

Sometime before June 14, 1996, Snowline hired VTD to conduct a "special analysis" concerning Cato I. VTD's report of its special analysis, dated June 14, 1996, concluded that attendance procedures had not been complied with, controls over the system appeared to be weak, and documentation standards were poor.

In January 1997, the District granted a charter to EFEP for the creation of Cato School of Reason II (Cato II). In about February 1997, Cato I ceased to operate as a charter school and was transformed into Cato II, with the same management and personnel. In April 1997, VTD entered into an agreement with Cato II to audit Cato II's financial position as of June 30, 1997.

From 1997 to January 28, 1998, Cato II entered into agreements with private schools to convert the schools into "satellites" of Cato II. Both before and after the conversion, the satellites charged tuition, and some of them taught religion, in violation of state and federal law.

### 2. Alleged wrongdoing by Cato II

In November 1997, the District learned that Congresswoman Maxine Waters, who represented the district in which Cato II was located, had stated

---

[1]All further statutory references are to the Education Code unless otherwise specified.

that Cato II had enrolled students from a private school. The District's board of education directed its administration to investigate the matter.[2]

In December 1997, Congresswoman Waters's daughter filed a complaint with the state Department of Education (DOE) alleging suspected misconduct by Cato II and/or EFEP, in that public funds were being used for a private school. The DOE transmitted the complaint to the District in February 1998.

On January 8, 1998, VTD issued its auditors' report regarding Cato I and II. The report concluded that the financial statements pertaining to Cato I and II fairly represented their financial position as of June 30, 1997. VTD's report also set forth information regarding days of attendance. The report stated the information was "fairly stated in all material respects in relation to the basic financial statements taken as a whole." The report did not disclose any attendance at schools that illegally taught religion. The District received the report in March 1998.

The District hired James Quinn, Jr., an accountant, who commenced an audit of Cato II student attendance in March 1998. In April 1998, a former employee of Cato II/EFEP provided the District with documentation regarding wrongdoing by Cato II/EFEP, including the recruitment of satellite schools which taught religion or charged tuition.

The District received advice from counsel regarding its investigation of Cato II in April and May 1998. The District's counsel met with Quinn in June 1998. Quinn issued a preliminary report regarding his audit of attendance accounting in August 1998. In September 1998, the District's accountant and legal counsel met with Cato/EFEP's legal counsel and management consultant/CPA and arranged for an audit of Cato/EFEP records.

In August 1998, the District learned of VTD's June 14, 1996 "special analysis," which had found Cato I's documentation and attendance standards to be inadequate. In November 1998, the District revoked the Cato II charter, effective February 1999.

### 3. *Controller's audit and the District's appeal*

In March 1999, the District reported the facts set forth above to the DOE. As a result, the State Controller (the Controller) conducted an audit of ADA

---

[2]The District's complaint alleged that it became aware of Congresswoman Waters's statement in November 2000. That appears to have been an error, as the complaint subsequently alleged that the District's superintendent wrote a memorandum to its board of education about the matter in November 1997.

for the Cato school or schools for the period January 1997 through December 1998. The Controller's report of the audit stated that the District had received about $4.4 million more in funding during the audit period than it was entitled to receive, due to improper ADA claims for charter school sites converted from private schools, which the Act did not permit. The report also stated that Cato II had taught religion at six charter school sites, in violation of the Act. The District appealed the Controller's audit, and the appeal is pending.

### 4. *Defendants' alleged negligence*

According to the complaint, the District relied on the false representations of defendants in their January 8, 1998, auditors' report that the Cato I and II financial statements fairly represented their financial position and that information regarding days of attendance was fairly stated. As a result, the District was induced to cause the state to issue apportionment funds to Cato II through the District. Defendants had no reasonable grounds for believing their representations to be true.

### D. *Additional Facts*

In addition to the facts alleged in its complaint, the District in opposing defendants' demurrer submitted documents relating to its appeal of the Controller's audit, of which the District requested judicial notice. Those documents included the January 24, 2000, audit report by the Controller; the August 29, 2000, proposed decision by the Office of Administrative Hearings Administrative Law Judge (ALJ), issued to the California Education Audits Appeal Panel (EEAP) pursuant to section 41344; and the February 20, 2001, order of the EEAP rejecting the proposed decision and remanding the matter for further evidence.

The record does not reflect whether the court took judicial notice of the documents. But whether it did or not, we may properly consider them as an indication of the facts the District would have alleged had it been granted leave to amend the complaint. (See *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 260 [108 Cal.Rptr.2d 739]; *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 [96 Cal.Rptr.2d 354] [plaintiff may show for first time on appeal how complaint can be amended to state a cause of action].) As relevant here, the documents showed the following.

In its appeal, the District contested the Controller's finding that the District was liable for the overpayment of state apportionment funds to Cato

II. The District asserted that liability was inappropriate because it exercised due diligence in its relationship with Cato II.

The ALJ made the following relevant findings:

The District received daily attendance figures from Cato II on a monthly basis. The District calculated the apportionment due and forwarded the required forms to the DOE. Upon receipt of the apportionment funds, the District forwarded them, less its processing fees, to Cato II.

After it became concerned that Cato II might have improperly received state funds, the District commenced its investigation and began withholding state apportionment funds earmarked for Cato II in July 1998. The District withheld a total of $3,492,742.

On November 4, 1998, the District and Cato II entered into a settlement agreement. The parties agreed that cause might exist for the revocation of Cato II's charter in that Cato II might have received state funds based on ADA which did not qualify for such funds. The agreement provided for the parties' cooperation in the expeditious reimbursement of any state funds received as a result of ineligible ADA.

Based on his factual findings, the ALJ concluded the District was not liable for the overpayments. There was no provision in the applicable statutes for holding a school district liable for acts of its charter school. General principles of tort law did not support liability because there was no evidence the District knew or should have known that Cato II violated the law. Contract law did not support holding the District liable because neither the Cato II charter nor the agreement supplementing the charter provided for such liability.

In its February 2001 order, the EEAP declined to adopt the ALJ's proposed decision. The EEAP remanded the matter for additional evidence on, among other issues, the authority by which the District withheld funds from Cato II, its disposition of the funds, and how the District discharged its oversight responsibilities and statutory obligations.

E. *Procedural Background*

The District brought this action in December 2000, seeking damages for negligent misrepresentation. Defendants demurred based on the two-year statute of limitations contained in Code of Civil Procedure section 339, subdivision 1. The court sustained the demurrer without leave to amend. The District filed this appeal.

II

DISCUSSION

A. *Standards of Review*

On appeal from the sustaining of a demurrer, this court assumes the truth of all material facts properly pled. The judgment must be reversed if the plaintiff has stated a cause of action under any possible legal theory. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) In deciding that question, the court exercises its independent judgment. (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598].)

Sustaining a demurrer without leave to amend is error if there is a reasonable possibility the defect can be cured by amendment. (*Aubry v. Tri-City Hospital Dist., supra*, 2 Cal.4th at pp. 966-967.) Denial of leave to amend is reviewed for abuse of discretion. (*Montclair Parkowners Assn. v. City of Montclair, supra*, 76 Cal.App.4th at p. 790.)

B. *Discovery*

As the parties recognize, the statute of limitations for malpractice by an accountant is two years. (Code Civ. Proc., § 339, subd. 1;[3] *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 608 [38 Cal.Rptr.2d 150, 888 P.2d 1279] (*Feddersen*).) The statute begins to run when (1) the aggrieved party discovers the negligent conduct causing the loss or damage and (2) the aggrieved party has suffered actual injury as a result of the negligent conduct. (*Feddersen, supra*, at pp. 613-614.) Here, the trial court ruled that the allegations of the complaint showed the District was aware of the illegal charter schools by April 1998 and suffered actual injury when it hired an accountant and attorney at or about that time.

The District contends it did not, and could not, discover defendants' negligent misrepresentations until 1999, making its December 2000 complaint timely. Specifically, the District contends it was not on notice of the misrepresentations until January 2000, when the Controller issued its audit report, or at the earliest March 1999, when the District referred the matter to the DOE.

---

[3]Code of Civil Procedure section 339, subdivision 1 provides for a two-year limitation period for "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing . . . ."

We reject the District's contention. ▮ "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. . . . So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 [245 Cal.Rptr. 658, 751 P.2d 923], fn. omitted.) ▮ These principles apply in accounting malpractice actions. (*Curtis v. Kellogg & Andelson* (1999) 73 Cal.App.4th 492, 501 [86 Cal.Rptr.2d 536].)

It is clear from the face of the complaint in this case that the District had at least "a suspicion of wrongdoing" (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d 1103, 1111) by defendants more than two years before it filed suit. The District alleged it became aware of defendants' audit report, which contained the alleged misrepresentations regarding Cato II's ADA reporting, in March 1998. The District further alleged that by or before November 1998, more than two years before suit was filed, the following had occurred: the District had learned that Congresswoman Waters had accused Cato II of improperly enrolling students from a private school, and the District had directed its administration to investigate the matter; the District had received the complaint filed by Congresswoman Waters's daughter with the DOE; the District had hired Mr. Quinn to audit Cato II student attendance; a former employee of Cato II/EFEP had informed the District that Cato II had recruited ineligible satellite schools; the District had learned of VTD's June 14, 1996, "special analysis," which had found deficiencies in Cato I's attendance accounting procedures; and the District had revoked Cato II's charter. These circumstances show beyond dispute that by November 1998 the District knew or should have known the alleged misrepresentations in defendants' audit report, to the effect that Cato II's ADA records were accurate, might be incorrect.

The District has not shown it could amend to cure this defect. In fact, the material of which the District requested judicial notice merely reinforces the conclusion that the District was on notice of defendants' alleged negligence not later than November 1998. As stated, the ALJ found the District began withholding state apportionment funds earmarked for Cato II in July 1998 because it was concerned Cato II had improperly received such funds. The ALJ also found the District had entered into an agreement with Cato II in November 1998 which provided for the reimbursement of any state funds received as a result of ineligible ADA.

The circumstances therefore establish that the District had at least a suspicion of defendants' wrongdoing more than two years before it filed suit in December 2000. That suspicion was sufficient to satisfy the discovery element for commencement of the statute of limitations.

## C. *Actual Injury*

The remaining requirement for commencement of the statute of limitations is that the plaintiff have suffered actual injury as a result of the negligent conduct. (*Feddersen, supra,* 9 Cal.4th 606, 613-614.) The District contends it did not suffer actual injury until January 2000, when the Controller issued its audit report claiming the District was responsible for the alleged overpayments to Cato II. Until that time, the District argues, its possible liability for the overpayments was merely speculative and could not constitute actual injury.

The courts, including the California Supreme Court, have found the question of when professional negligence causes actual injury to be worthy of considerable discussion. (See, e.g., *Adams v. Paul* (1995) 11 Cal.4th 583, 594 [46 Cal.Rptr.2d 594, 904 P.2d 1205] (conc. opn. of Kennard, J.) ["[t]his is the third time in the past two years that the court has addressed this question"]; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 765 [76 Cal.Rptr.2d 749, 958 P.2d 1062] (conc. opn. of Kennard, J.) ["[t]his is the fourth decision in as many years in which this court has addressed the question of what constitutes 'actual injury' from professional malpractice for purposes of applying a statute of limitations"].) Most of the decisions considering the question do so in the context of legal malpractice. *Feddersen, supra,* 9 Cal.4th 606, however, considered the question in the context of accounting malpractice. Since this case involves a claim of accounting malpractice, and since *Feddersen* emanates from our Supreme Court, we consider its possible applicability first.

### 1. *Feddersen*

In *Feddersen,* the court considered what it called a "narrow" issue: "when *actual injury,* caused by an accountant's negligent filing of tax returns, occurs so as to commence the running of the two-year statute of limitations period of Code of Civil Procedure section 339, subdivision 1 . . . ." (*Feddersen, supra,* 9 Cal.4th 606, 608.) The court concluded that "actual harm occurs on the date the tax deficiency is assessed" by the Internal Revenue Service (IRS). (*Id.* at p. 609.) It explained, "Prior to the penalty assessment, the preliminary findings of the auditor as noted in the audit report are merely *proposed* findings, subject to review and negotiation." (*Id.* at pp. 608-609; see also p. 612.)

The *Feddersen* court rejected the proposition that actual injury occurred before the audit process was complete, when the client withdrew a settlement offer in an unrelated matter and the client's bank reduced its line of credit, both in anticipation that the client would have to pay more tax as a result of the audit. The court stated that "an inchoate or potential injury cannot give rise to a professional malpractice action until there has been an actual determination that the accountant's alleged negligence is related to the deficiency assessment." (*Feddersen, supra,* 9 Cal.4th 606, 620.) Prior to that time, "the question whether the taxpayer suffered actual injury as a result of the accountant's allegedly negligent preparation of the tax returns is contingent on the outcome of the audit." (*Id.* at p. 619.)

*Feddersen* at least arguably supports the District's contention that it suffered no actual injury until the Controller determined to hold the District liable for the overpayments to Cato II. If a taxpayer suffers no actual injury until the IRS finally assesses a deficiency, then seemingly persons injured by accountant malpractice in other contexts should not be held to have suffered actual injury until some claim of legal liability is made against them as a result of the malpractice. However, we are not persuaded *Feddersen* should be applied in that manner in this case, for the following reasons.

First, we note that *Feddersen* did *not* say there could never be actual injury *in fact* until the IRS assessed a deficiency. To the contrary, the court expressly acknowledged that "[o]bviously, in some cases *injury will be clear* before the notice of deficiency is given to the taxpayer." (*Feddersen, supra,* 9 Cal.4th 606, 621, italics added.) Notwithstanding that acknowledgment, the court concluded that "uniformity in application serves a more important function when interpreting statutes of limitation than does the identification of the precise point at which some harm might be said to have occurred . . . ." (*Id.* at pp. 621-622.) Therefore, it held the triggering event should be the deficiency assessment, because use of that date "provides the parties with a bright line that, once crossed, commences the limitations period under section 339, subdivision 1, and therefore provides certainty in terms of the statute's application." (*Id.* at p. 621.)

Thus, it appears the *Feddersen* court based its holding not on a conclusion that no actual injury occurs until there is a final IRS assessment, but on its determination that in the context of negligent tax return preparation, the need for uniformity overrides the usual considerations that dictate when the statute of limitations should be deemed to commence. Not surprisingly, therefore, subsequent decisions have given *Feddersen*'s bright-line holding only narrow application. In fact, the same year *Feddersen* was decided, the

Supreme Court stated that *Feddersen* involved "very narrowly drawn circumstances" and "did not articulate a 'rule for all seasons.' " (*Adams v. Paul*, *supra*, 11 Cal.4th 583, 588 (lead opn. of Arabian, J.).) More recently, in *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison, supra*, 18 Cal.4th 739 (*Jordache*), the court again stated that ". . . *Feddersen* presented specialized circumstances and did not articulate a rule of broad or general applicability." (*Id.* at p. 763.)

The Fifth District considered whether to apply *Feddersen*'s bright-line rule to an accounting malpractice claim in *Van Dyke v. Dunker & Aced* (1996) 46 Cal.App.4th 446 [53 Cal.Rptr.2d 862] (*Van Dyke*). The plaintiffs in *Van Dyke* claimed they donated property in reliance on their accountant's erroneous advice that they would receive a full tax deduction. Later, the accountant told the plaintiffs they could claim only a partial deduction and filed a return claiming only the lesser amount. The ultimate amount allowed was not determined until still later, as a result of negotiations between the plaintiffs' new tax preparer and the IRS.

Relying on *Feddersen*, the plaintiffs contended they did not suffer actual injury until the IRS finally determined the amount of the deduction. (*Van Dyke, supra*, 46 Cal.App.4th at p. 452.) The court, however, held that "the *Feddersen* rule was expressly limited to a specific type of accountant malpractice; i.e., 'the negligent preparation of tax returns.' [Citation.]" (*Id.* at p. 454.) The alleged malpractice in *Van Dyke* was not negligent tax return preparation but the erroneous tax advice upon which the plaintiffs had relied to their detriment. (*Ibid.*) The court therefore concluded that the plaintiffs suffered actual injury, and the statute of limitations began to run, either when the plaintiffs donated the property in reliance on the erroneous tax advice or when they filed their return and paid taxes in excess of the amount they expected to pay. (*Id.* at p. 455.)

■ *Van Dyke* and this case are similar in several respects. As in *Van Dyke*, the alleged malpractice in this case was not negligent preparation of a tax return, but a representation which induced detrimental reliance. In *Van Dyke*, the reliance occurred when the plaintiffs donated the property. The court held the plaintiffs sustained actual injury either at that point or when they filed their return after discovering the error and suffered out-of-pocket losses by paying more taxes than they had expected to pay. (*Van Dyke, supra*, 46 Cal.App.4th at p. 455.)

Here, the alleged detrimental reliance occurred when the District, based on defendants' 1998 audit report, provided state apportionment funds to Cato

II. By analogy to *Van Dyke*, the District sustained actual injury either at that point or after it suspected the error and suffered out-of-pocket losses by paying investigation and legal fees in an effort to determine the extent of the improper payments. In either case, the statute of limitations lapsed.

*Van Dyke* does not, of course, bind this court, and its persuasiveness depends on whether it is consistent with the California Supreme Court decisions which do bind us. We have already noted the Supreme Court's statements in *Adams v. Paul, supra,* 11 Cal.4th 583, 588 and in *Jordache, supra,* 18 Cal.4th 739, 763, to the effect that *Feddersen* did not articulate a rule of broad or general applicability. Those statements support *Van Dyke*'s determination that the *Feddersen* rule should not apply outside of the factual context in which it was formulated, i.e., negligent preparation of a tax return.

We also believe *Van Dyke*'s conclusion that actual injury can occur before there has been a determination of the aggrieved party's liability is consistent with the Supreme Court's analysis in *Jordache*. We turn now to a discussion of that decision.

### 2. *Jordache*

In *Jordache, supra,* 18 Cal.4th 739, the Supreme Court considered the question of "actual injury" in a legal malpractice case based on a law firm's failure to advise its client that it might have insurance coverage for a lawsuit against the client.[4] As a result of the firm's omission, the client delayed in tendering the defense of the suit to its insurer. The client ultimately settled its coverage claim against its insurer for less than the full amount of the claim. The Court of Appeal held there was no actual injury until the settlement occurred.

The Supreme Court, however, concluded that "actual injury occurred before the client's settlement with the insurer." (*Jordache, supra,* 18 Cal.4th 739, 743.) The court explained that "the determination of actual injury does not necessarily require some form of adjudication, judgment, or settlement." (*Id.* at p. 755.) The delay in claiming coverage gave the insurer a potential defense, which increased the client's cost to litigate the coverage claim and

---

[4]The statute of limitations at issue in *Jordache* was Code of Civil Procedure section 340.6. That section provides that a legal malpractice action must be commenced within one year after the plaintiff discovers or should discover the relevant facts, or four years from the wrongful act or omission. (Code Civ. Proc., § 340.6, subd. (a).) For our purposes, the relevant provision of section 340.6 is subdivision (a)(1), which states that the limitations period shall be tolled during the time that "[t]he plaintiff has not sustained actual injury."

reduced the settlement value of the claim. The delay also required the client to pay its own defense costs for several years. The fact the client might have recouped its losses had it won the coverage action did not prevent the statute of limitations from starting to run: "An existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred. [Citations.]" (*Id.* at p. 754.)

■ Accordingly, the *Jordache* court articulated this test: "The test for actual injury under [Code of Civil Procedure] section 340.6, therefore, is whether the plaintiff has sustained any damages compensable in an action, other than one for actual fraud, against an attorney for a wrongful act or omission arising in the performance of professional services." Although determining when actual injury occurred is "predominantly a factual inquiry," when the material facts are undisputed, the trial court can resolve the matter as a question of law. (*Jordache, supra,* 18 Cal.4th 739, 751.)

■ *Jordache* strongly supports the ruling of the trial court in this case that the District suffered actual injury as a result of defendants' alleged negligence more than two years before December 2000. By that time, according to its complaint, the District had provided state funds to Cato II to which Cato II was not entitled, in reliance on defendants' misrepresentations. In an effort to determine the extent of the improper payments, the District was obliged, in March 1998 or before, to pay investigation and legal fees. The District also obligated itself, in its November 1998 agreement with Cato II, to cooperate in the expeditious reimbursement of any state funds improperly received.

The District's situation was analogous to that of the client in *Jordache*, which delayed in tendering coverage to its insurer due to the negligence of its attorneys. The *Jordache* court concluded the delay in tendering coverage injured the client, by increasing its cost to litigate the coverage claim, reducing the settlement value of the claim, and requiring the client to pay its own defense costs for several years. The court noted the "established rule that attorney fees incurred as a direct result of another's tort are recoverable damages. [Citations.]" Therefore, under the *Jordache* test for actual injury—whether the plaintiff has sustained damages compensable in a malpractice action—the attorney fees constituted actual injury which triggered the statute. (*Jordache, supra,* 18 Cal.4th 739, 751.)

Investigation costs, like the attorney fees in *Jordache*, are recoverable tort damages under Civil Code section 3333. (*Stearman v. Centex Homes* (2000)

78 Cal.App.4th 611, 625 [92 Cal.Rptr.2d 761] [plaintiffs in construction defect case could recover as damages under § 3333 fees paid to "professionals who investigated the problems in order to formulate an appropriate repair plan"].) As in *Jordache*, therefore, the out-of-pocket expenses the District incurred when it engaged its accountant and legal counsel, in an effort to determine the extent of the improper payments and arrange for reimbursement of funds improperly received, constituted actual injury for limitations purposes.

At oral argument, the District contended for the first time that, since section 41344, which governs repayment by a school district of apportionment funds improperly received, did not go into effect until July 1999, the District had no liability for repayment and could not have suffered actual injury until at least that date. However, even before section 41344 came into effect, the Education Code provided for recoupment by the state of funds improperly received by a school district. Section 41341, enacted in 1976, provides that, if the amount apportioned to a school district exceeds the amount to which the district was entitled, the Superintendent of Public Instruction shall withhold the excess amount from the district's apportionment for the next fiscal year. (§ 41341, subd. (a)(1).) In this case, the improper apportionments represented not only money disbursed to Cato II, but also money which the District kept for itself. According to the record, when the District paid state apportionment funds to Cato II, it retained a part of those payments as a processing fee pursuant to its agreement with EFEP.[5]

The District contends section 41341 could not be applied to require withholding in this case because section 47610 generally exempts charter schools from the laws governing school districts. We do not think it follows from the fact that a charter school is exempt from laws governing school districts that a school district itself is exempt from any liability for reimbursement when it improperly receives and issues state funds to its charter school. But even if the District is correct, the District still sustained economic loss when it paid out-of-pocket expenses to determine the extent of the improper payments. Under *Jordache*, those expenses constituted actual injury for limitations purposes.

The fact that the District might have avoided liability to the state for the improper payments if the Controller had not pursued the matter, or if the District successfully appealed the Controller's decision, did not negate the

---

[5]Section 47613 authorizes a chartering agency to charge a percentage of the revenue of a charter school as a fee for actual costs of supervisorial oversight of the charter school. (§ 47613, subd. (a).)

injury. In *Jordache,* the client similarly might have avoided the consequences of its delay in tendering coverage to its insurer if the insurer had not invoked the defense of delay, or if the client had won the coverage action despite the defense. Yet the court held that possibility did not prevent a finding of actual injury for limitations purposes. (*Jordache, supra,* 18 Cal.4th 739, 754.)

Several Court of Appeal decisions in the legal malpractice context, though they predate *Jordache,* anticipated its holding that actual injury can occur without a determination of liability, and therefore are instructive here. In the first case, *Hensley v. Caietti* (1993) 13 Cal.App.4th 1165 [16 Cal.Rptr.2d 837], the plaintiff claimed she had signed an unfavorable marital settlement agreement on the advice of her attorney. The court held the plaintiff sustained "actual injury" when she signed the agreement, not later when the ensuing judgment became effective. (*Id.* at pp. 1173-1174.) It reached that conclusion notwithstanding its recognition that the plaintiff might later be able to avoid the effect of the agreement by attacking its validity: "The consideration that the injury attributable to entry into the contract may be remediable by the attack on the contract does not render the injury harmless. [Citation.]" (*Id.* at pp. 1175-1176.)

In *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217 [31 Cal.Rptr.2d 525], the plaintiff claimed its attorney negligently failed to advise the plaintiff it had to exercise a development right within three years, and the time expired. The plaintiff filed litigation against a third party in an effort to revive the development right, but lost. The Court of Appeal, per Justice Chin, held actual injury occurred when the development right expired and not when the third party litigation was resolved. The court reached that conclusion despite the fact the plaintiff could have avoided the effects of the malpractice had it won the litigation. (*Id.* at p. 227.)

In *Radovich v. Locke-Paddon* (1995) 35 Cal.App.4th 946 [41 Cal.Rptr.2d 573], a husband claimed his attorneys negligently caused him to sign documents waiving his community property rights in various assets. The court held the husband sustained damage when he signed the documents, not years later when his wife died and the community property was divided. (*Id.* at pp. 974, 977.) It further held that the fact the husband remedied some of his losses by filing litigation against third parties did not mean actual injury did not occur when he signed the documents: "[O]nce actual injury has been found, the fact the injury is not 'irremediable' is of no consequence to the section 340.6 issues . . . ." (*Id.* at pp. 978-979.)

The Supreme Court has given no indication that it disagrees with the analyses in *Hensley, Foxborough,* or *Radovich.* In fact, the court has cited all

three decisions in its own opinions. (See *Adams v. Paul, supra,* 11 Cal.4th 583, 590 [citing *Hensley*]; *Jordache, supra,* 18 Cal.4th 739, 744, 754-755 [citing *Foxborough*]; *Samuels v. Mix* (1999) 22 Cal.4th 1, 7, 15-18 [91 Cal.Rptr.2d 273, 989 P.2d 701] [citing *Radovich*].) The decisions are significant because they demonstrate that a party's alteration of its legal position in reliance on its counsel can constitute actual injury even though the party may be able to avoid or reduce the injury through subsequent legal action.

Here, the District alleged it relied on defendants' alleged misrepresentations when it provided apportionment funds to Cato II: " . . . Defendants induced Plaintiff to process the attendance apportionment regarding student attendance at Cato satellites which taught religion, and caused the state to issue state apportionment funds to Cato through Plaintiff." The record shows the District took these actions at least as early as 1997. Under the authorities discussed *ante,* actual injury occurred no later than early 1998, when the District recognized the allegedly improper conduct and incurred out-of-pocket expenses to determine its extent. That the District may ultimately avoid liability for the improper payments through its pending appeal does not mean it did not suffer injury.

For these reasons, we conclude that under *Jordache* and the Court of Appeal decisions anticipating its holding, actual injury occurred in this case more than two years before the District filed suit. We therefore must decide whether the analysis employed in those cases, all of which involved legal malpractice, should apply in a case of accounting malpractice such as this one.

### 3. *Application of the Jordache analysis to this case*

Because *Jordache* was a legal malpractice case, it involved a different statute of limitations—Code of Civil Procedure section 340.6—than the one involved here. The court did not purport to extend its holding to other types of professional negligence. In fact, the court specifically stated it had no occasion to reexamine *Feddersen,* because *Feddersen* involved accounting malpractice and a different statute of limitations. (*Jordache, supra,* 18 Cal.4th at p. 764, fn. 10.)

The *Jordache* court did, however, reexamine *ITT Small Business Finance Corp. v. Niles* (1994) 9 Cal.4th 245 [36 Cal.Rptr.2d 552, 885 P.2d 965] (*ITT*). In *ITT,* the court had held that "in transactional legal malpractice cases, when the adequacy of the documentation is the subject of dispute, an

action for attorney malpractice accrues on entry of adverse judgment, settlement, or dismissal of the underlying action." (*Id.* at p. 258.) As the *Jordache* court noted, *Feddersen* had relied in part on *ITT*. (*Jordache, supra,* 18 Cal.4th at p. 764, fn. 10.) *Jordache* rejected the requirement of an adverse judgment, settlement, or dismissal, holding "that the rules *ITT* advanced cannot be reconciled with the particularized factual inquiry required to determine actual injury under section 340.6 . . . ." (*Id.* at p. 763.)

Notwithstanding the lack of a statement from the Supreme Court that *Jordache*'s reasoning should apply to accounting malpractice cases, we are convinced that it should apply except to cases which fall within *Feddersen*'s narrow holding governing negligent tax return preparation. We reach this conclusion in view of the discussion in both *Feddersen* and *Jordache* of the genesis of the "actual injury" requirement. As *Feddersen* pointed out, the requirement of actual injury under Code of Civil Procedure section 339, subdivision 1 came originally from decisions in legal malpractice cases, which were governed by that statute prior to the enactment of Code of Civil Procedure section 340.6. The court identified two of those decisions, *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421] and *Budd v. Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433]. (*Feddersen, supra,* 9 Cal.4th at pp. 613-614.)

*Jordache* noted the role of those same decisions in the Legislature's enactment of the actual injury provision of section 340.6, stating that "the pertinent legislative history shows how the actual injury tolling provision derived from the holding in *Budd*." (*Jordache, supra,* 18 Cal.4th at p. 748, fn. omitted.) The *Jordache* court also stated it was "reaffirm[ing] the basic principles established in *Budd* . . . ." (*Id.* at p. 743.)

As the Supreme Court's discussion in *Feddersen* and *Jordache* demonstrates, while different statutes of limitations now govern legal and accounting malpractice, the "actual injury" requirement which applies in both contexts shares a common origin. That being the case, we can see no reason for interpreting the requirement differently in accounting cases than in legal malpractice cases, except in unusual situations where the need for uniformity requires a bright-line rule, as the court found to be true in *Feddersen*.

Application of the *Jordache* analysis to this case also is supported by the *Jordache* court's observation that requiring a determination of liability as a prerequisite for actual injury "would give a client who has sustained actionable damages, and who is aware of the attorney's error, unilateral control over the limitations period." (*Jordache, supra,* 18 Cal.4th 739, 755.) The

client could extend the statute indefinitely by pursuing remedies designed to avoid liability, such as the coverage action in *Jordache*. The client could then sue the attorney years later if the remedies did not work.

The same would be true in this case if we accepted the District's argument that it suffered no injury until the Controller determined to hold it responsible for the overpayments. The District, according to its complaint, began receiving information of wrongdoing by Cato II in November 1997 and commenced its investigation by or before March 1998. It did not apprise the DOE of the facts until a year later, and as a result the Controller did not issue its audit report until January 2000, two years after defendants' alleged negligent misrepresentations. The District did not file suit until almost a year later.

Nothing would have prevented the District from waiting even longer to report the facts to the DOE. If we were to hold that the statute of limitations did not start to run until the Controller conducted its audit and determined the District should be held liable, the District would have a unilateral ability to delay the accrual of its cause of action indefinitely. That result would be contrary to one of the principal purposes underlying statutes of limitations, preventing the litigation of stale claims. (See *Samuels v. Mix, supra,* 22 Cal.4th 1, 13.)

We therefore conclude the *Jordache* analysis of the actual injury requirement should apply here. Under that analysis, as we have discussed, the District suffered actual injury when it recognized the allegedly improper apportionment payments to Cato II and incurred expenses in an attempt to determine the extent of the improper conduct. As this occurred more than two years before the District filed suit, the trial court correctly held its claim was barred.

D. *Equitable Tolling*

The District argues that, even if the statute of limitations began to run more than two years before it filed suit, the statute was and is suspended by the pendency of the Controller's audit and the EEAP appeal, pursuant to the equitable tolling doctrine. ■ That doctrine provides that " 'the running of the limitations period is tolled "[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one." [Citations.]' " (*Addison v. State of California* (1978) 21 Cal.3d 313, 318 [146 Cal.Rptr. 224, 578 P.2d 941].) Application of equitable tolling requires "timely notice, and

lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff." (*Id.* at p. 319.)

Equitable tolling typically applies where the plaintiff pursues an alternative remedy *against* the defendant in the second suit. In *Addison v. State of California, supra,* 21 Cal.3d 313, for example, the Supreme Court held the period for filing a state court suit was tolled while the plaintiff pursued a federal court suit on the same claims against the same defendants. The court noted that, "since the federal court action was timely filed, defendants were notified of the action and had the opportunity to begin gathering their evidence and preparing their defense." (*Id.* at p. 319.) The defendants thus "were fully notified within the [limitations] period of plaintiffs' claims and their intent to litigate." (*Id.* at p. 321.)

Similarly, in *Elkins v. Derby* (1974) 12 Cal.3d 410 [115 Cal.Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839], the Supreme Court held the statute of limitations on a personal injury action was tolled during the pendency of the plaintiff's workers' compensation claim against the same defendants. The court explained, "Defendants' interest in being promptly apprised of claims against them in order that they may gather and preserve evidence is fully satisfied when prospective tort plaintiffs file compensation claims within one year of the date of their injuries. . . . After the filing of a compensation claim, the employer can identify and locate persons with knowledge of the events or circumstances causing the injury. By doing so, he takes the critical steps necessary to preserve evidence respecting fault." (*Id.* at pp. 417-418.)

The requirement that the alternative proceeding apprise the defendant of the nature of the claim and the plaintiff's intent to litigate has led several courts to conclude that, where the first proceeding does not seek relief against the defendant in the second proceeding, equitable tolling does not apply. In *Garabedian v. Skochko* (1991) 232 Cal.App.3d 836 [283 Cal.Rptr. 802], the plaintiff was injured on property owned by the United States Department of Housing and Urban Development (HUD). Within the one-year limitation period, he filed a tort claim with HUD. HUD informed him that the property was managed by Skochko, an independent contractor.

The plaintiff later sued Skochko, more than one year after the accident. The court held that the pendency of the claim against HUD did not toll the statute of limitations against Skochko, stating that, "although filing the claim with HUD put the agency on notice of appellant's intended suit against the government, it did not put respondent on notice of appellant's intended suit against him." (*Garabedian v. Skochko, supra,* 232 Cal.App.3d at p. 848.)

In *Thompson v. California Fair Plan Assn.* (1990) 221 Cal.App.3d 760 [270 Cal.Rptr. 590], the plaintiff sued an insurer and obtained a declaratory judgment reforming a policy to name her as the insured. She then sued the insurer and a claims manager for conspiracy to deprive her of the insurance benefits. The court held the statute of limitations on the suit against the claims manager was not tolled by the prior suit against the insurer: "Here [the claims manager] was not named in the first suit for declaratory relief. It is difficult to imagine how he could have been alerted to the need to investigate the facts of the second claim." (*Id.* at p. 765.)

In *Dowell v. County of Contra Costa* (1985) 173 Cal.App.3d 896 [219 Cal.Rptr. 341], the court held that the plaintiff's claim against the county was not tolled pending her claim against the state based on the same accident: "Dowell's failure to file suit against the County until action on her claim against the state did not provide the County with notice of her intention to bring suit or prevent prejudice to the County in gathering information and preparing its defense. Since the claim proceedings against the state and County were entirely separate and the County was not put on notice of Dowell's intention to sue, the doctrine of equitable tolling was inapplicable." (*Id.* at p. 903.)

We are aware of decisions applying equitable tolling against defendants who were not parties to the prior actions. However, those decisions involve fact situations in which the defendants clearly had notice of the claims against them before the statutes expired. In *Structural Steel Fabricators, Inc. v. City of Orange* (1995) 40 Cal.App.4th 459 [46 Cal.Rptr.2d 867], a subcontractor sued a general contractor and its surety seeking payment for construction work. Later, the subcontractor sued the city in a separate action to enforce a stop notice, seeking payment for the same work.

Although the city was not a defendant in the first suit, the court held the statute of limitations on the second suit was tolled while the first suit was pending. (*Structural Steel Fabricators, Inc. v. City of Orange, supra,* 40 Cal.App.4th 459, 466.) As the court noted, the facts showed the city was clearly on notice of the claim against it within the limitations period. Before it sued the contractor and surety, the subcontractor served a stop notice on the city demanding that it withhold payment from the surety to cover the subcontractor's claim. (*Id.* at p. 462.) In addition, at the time it sued the general contractor and surety, the subcontractor sent the city a letter informing it of the lawsuit and stating the city might also be liable. (*Id.* at p. 466.)

In *Stalberg v. Western Title Ins. Co.* (1994) 27 Cal.App.4th 925 [32 Cal.Rptr.2d 750], the plaintiffs' title insurer had recorded deeds for upstream

property owners, which included a fictitious easement across the plaintiffs' properties. The plaintiffs discovered the easement and filed a quiet title suit against the upstream owners. After the statute of limitations expired, the plaintiffs filed a separate slander of title suit against their insurer.

The court held equitable tolling applied. It noted that, when the plaintiffs first discovered the easement, they were unaware of the role the insurer had played in creating it. When the plaintiffs pursued their quiet title action, they gave timely notice to the insurer, and the insurer participated in the quiet title action by partially financing it and by receiving frequent updates on its progress from the plaintiffs' attorney. During the quiet title action, when the plaintiffs learned the insurer was responsible for recording the easement, they informed the insurer of its culpability. (*Stalberg v. Western Title Ins. Co., supra*, 27 Cal.App.4th 925, 932-933.)

These decisions persuade us that, absent circumstances such as those involved in *Structural Steel Fabricators, Inc. v. City of Orange, supra*, 40 Cal.App.4th 459, and *Stalberg v. Western Title Ins. Co., supra*, 27 Cal.App.4th 925, equitable tolling should not apply where the first proceeding did not involve the defendant sued in the second proceeding. The record does not reflect any such circumstances in this case. There is no indication that the pendency of the Controller's audit—the only event which occurred within the limitations period—put defendants on notice that the District intended to assert liability against them. The District sought no relief against defendants in connection with the audit or the appeal from it. The Controller and the ALJ were not asked to, and did not, determine whether defendants should have been aware of, and disclosed, Cato II's improper conduct.

The District asserts that defendants "have been provided timely notice of the District's appeal before the EEAP and have been kept abreast of its progress throughout the course of the instant litigation." The portion of the record the District cites in support of that assertion consists merely of the proposed decision of the ALJ, the EEAP order declining to adopt the proposed decision and remanding the matter, and the subsequent order of the ALJ requiring the parties to state whether they intend to present evidence on remand. These documents do not show that defendants were given notice, within the limitations period, that the District was seeking to hold defendants liable for negligent misrepresentation.

Neither the complaint nor the other documents in the record contain facts on which the District properly could invoke equitable tolling. The equitable tolling doctrine therefore does not support the District's claim for reversal.

## III

### DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.

Hollenhorst, Acting P. J., and Ward, J., concurred.

A petition for a rehearing was denied June 26, 2002, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 14, 2002.