Filed 11/16/17; Certified for Publication 12/11/17 (order attached)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| NELSON CHOI et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>SAGEMARK CONSULTING et al.,<br><br>    Defendants, Cross-complainants<br>    and Appellants;<br><br>AMERICAN GENERAL LIFE<br>INSURANCE CO.,<br><br>    Cross-defendant and Respondent. | H041569<br>(Santa Clara County<br>Super. Ct. No. 1-10-CV187143) |

This civil action arises from the provision of allegedly negligent and fraudulent financial planning advice involving a program for investment in life insurance and annuities under former section 412(i) of the Internal Revenue Code (the "412(i) Plan"). Plaintiffs claim that defendants induced them to establish the 412(i) Plan by misrepresenting its promised benefits and marketing it as a "safe" investment, even though they knew, or should have known, that the plan was likely to invite Internal Revenue Service (IRS) scrutiny. Plaintiffs also claim that defendants failed to take prompt action to mitigate damages when the IRS issued revenue rulings and regulations in 2004 and 2005 that called such 412(i) plans into question. Defendants cross-complained for indemnity and comparative fault against American General Life Insurance Company (American General), whose products funded plaintiffs' 412(i) Plan.

At issue in this appeal are defendants' and American General's separate motions for summary judgment, which the trial court granted after finding that plaintiffs' claims were time-barred. Plaintiffs contend that the trial court erred by (1) determining that the limitations period began to run as of September 2007, when plaintiffs were "on notice" that the IRS would impose penalties in connection with the 412(i) Plan, rather than in 2010 when penalties were assessed, (2) failing to consider any tolling effect created by the ongoing fiduciary relationship between defendants and plaintiffs, and (3) applying the September 2007 "notice" date as a bar to all causes of action in the complaint.

For the reasons stated herein, we affirm.

## I. BACKGROUND

### A. PLAINTIFFS' COMPLAINT

Husband and wife, Nelson Choi and Jeannie Choi (the Chois), and their closely-held corporation Choice Instruments, Inc. (together "plaintiffs") filed this action in November 2010 against their former financial advisors (individuals Matthew Roberson and Richard Brown, and Sagemark Consulting, Lincoln Financial Advisors, and Lincoln National Corporation—together "defendants"), asserting causes of action for negligence, fraud and deceit, and breach of contract.

According to the complaint, the Chois consulted in 2003 with Roberson and Brown of Sagemark Consulting, who also were authorized agents of Lincoln Financial, for assistance with investments, asset protection, and tax planning. Defendants advised the Chois that an Internal Revenue Code section 412(i) Plan retirement account was ideal for them and would provide tax advantages, asset protection, and steady income. It required a complex program of several steps. First, plaintiffs were to purchase large amounts of "whole life" insurance and pay annual premiums on a five-year schedule. Second, after five years the Chois would purchase the whole life policies from the 412(i) Plan at a low " 'cash surrender value,' " leaving cash in the 412(i) Plan account while the Chois would own the whole life policies personally. This allegedly would create a

2

" 'springing' " or increasing cash value for plaintiffs.  The third step was a " 'power play' " exchange of the whole life policies for certain American General Universal Life " 'Platinum Provider' " policies, which would allow plaintiffs to take advantage of generous borrowing provisions and tax-free cash flow based on the increased policy values.

Per defendants' recommendation, Choice Instruments bought the Chois individual American General whole life policies in 2003, which required annual premium payments on a five-year schedule through 2007, for a total purchase price of $1,275,000.  Defendants urged the Chois to buy similar policies in 2004, requiring premium payments over five years through 2008, for a total purchase price of $439,000.  The policies comprised 70 to 75 percent of the 412(i) Plan portfolio.  Defendants allegedly touted the "certainty of the immediate deductibility of such contributions" to the 412(i) Plan account, which they "assured . . . was appropriate and authorized by applicable tax law." They allegedly assured plaintiffs that the program was " 'bullet proof,' " time-tested, and carried no substantial risk of adverse IRS action or tax consequences.

The IRS audit began in 2006.  Plaintiffs alleged damages beginning in 2008, when contrary to the previously-represented " 'exit strategy' " of purchasing the whole life policies at the low cash surrender value, defendants advised them that the IRS would require fair market value.  Plaintiffs paid a total of $613,000 for the purchase of the four policies (approximately $300,000[1] over the anticipated cost).  Defendants advised plaintiffs to convert the 412(i) Plan to a traditional Internal Revenue Code section 412 Plan (the "412 Plan") because the IRS had adopted a negative view of the policies under the 412(i) Plan and considered them defective and not IRS-approved.  Defendants asserted that this was the fault of American General.

---

[1] Plaintiffs alleged a difference of approximately $212,000 for the 2003 policies and approximately $77,000 to $82,000 for the 2004 policies.

Plaintiffs alleged additional damages in 2008 and 2009 from the purchase of whole life policies through Penn Mutual, which they claimed defendants falsely advised was necessary to comply with the requirements of the converted 412 Plan and resulted in an "immediate loss" in cash value of approximately $470,000. Plaintiffs further alleged that in 2009, after the IRS audit ended, they were required to pay in excess of $440,000 in back taxes and interest for disallowed deductions under the 412(i) Plan, plus $60,000 in additional penalties, and faced future estimated payments of $100,000 to the Franchise Tax Board of California and anticipated IRS penalties of $600,000 for not reporting the transactions on form 8886.

Plaintiffs in sum alleged that defendants "misrepresented, concealed and failed to disclose" the risk that: (1) the "great weighting of life insurance policies" in excess of 50 percent of plan assets would render the 412(i) Plan "suspect and defective in the view of the IRS"; (2) the IRS would disallow the deductibility of contributions into the 412(i) Plan account for the life insurance purchases; (3) the " 'springing' " cash values would be suspect and unlikely to be approved by the IRS, so plaintiffs would be forced to pay far more (fair market value) than the low cash surrender value; (4) the "irrevocable right" to "power play" exchange the whole life policies for the superior " 'Platinum Provider' " policies was not guaranteed, because American General had a reservation of rights to change or withdraw policies; and (5) the policy purchases were most likely "reportable transactions to be listed on Form 8886" and could be considered abusive tax shelters. They alleged that they would have been better served by purchasing all or mostly annuities in a 412(i) Plan, or by "conventional investments," and that defendants' representations that the 412(i) Plan was time-tested and carried little risk of disallowance were false.

## B. DEFENDANTS' ANSWER AND CROSS-COMPLAINT

Defendants answered the complaint, pleading as an affirmative defense the bar of "the applicable statute of limitations, including but not limited to California Code of Civil

4

Procedure section 338." Defendants also cross-complained against American General for indemnity and comparative fault. Defendants assert on appeal that the cross-complaint was "wholly derivative" of plaintiffs' complaint, so if they were found not liable to plaintiffs, American General would not be liable to them.[2]

## C. SUMMARY JUDGMENT PROCEEDINGS

Defendants moved for summary judgment (Code Civ. Proc., § 437c)[3] in October 2013, and plaintiffs filed opposition in May 2014, following stipulated time extensions.

Defendants argued that plaintiffs could not prevail as a matter of law as to each cause of action, that plaintiffs' claims were barred by the applicable statute of limitations, and that the corporate defendants were not proper parties to the action. In support of the statute of limitations defense, defendants requested judicial notice of the filing date of plaintiffs' complaint (November 12, 2010) and of an IRS revenue ruling from March 2004. We summarize the evidence and arguments pertaining only to the statute of limitations issue.

Based on the November 2010 filing date of plaintiffs' complaint, defendants argued that plaintiffs were time-barred from asserting a negligence or breach of implied contract claim that accrued prior to November 2008, or a fraud claim that accrued prior to November 2007 (based on the applicable statutes of limitations for negligence (former § 339.1), breach of contract (§ 339), and fraud (§ 338, subd. (d)). Defendants offered two communications to show that plaintiffs were informed as of November 2006 that the IRS

---

[2] The record on appeal does not contain a copy of the cross-complaint against American General. We rely on defendants' statement that the cross-complaint was "wholly derivative" of plaintiffs' complaint only insofar as it appears to be consistent with the trial court's ruling on the motion for summary judgment, which addressed both defendants' and American General's motions for summary judgment.

[3] Unspecified statutory references are to the Code of Civil Procedure.

had identified defects in the 412(i) Plan, and as of September 2007 that there would be IRS penalties and damages accruing.

First, in a letter dated November 28, 2006, from the IRS to Choice Instruments, the IRS listed defects of the 412(i) Plan and recommended that plaintiffs unwind the plan and distribute the policies, or convert to a section 412 Plan.

Second, in an e-mail dated September 19, 2007, from Brown to the Chois, Brown said that "Dennis"[4] was "close to settling 28 out of 32 of his cases with the IRS" and "[a]lthough there will be penalties, some or all of it will be recaptured in your 2007 deduction." Brown explained that Dennis "believes that American General will come forward with some kind of favorable offer that will offset some of the penalty as well," and although he could not provide "exact numbers," "some kind of resolution" seemed to be close, at which point they would need "to talk about getting the policies out of the plan per the original strategy." Mr. Choi expressed some relief in response, stating that he hoped "settlement is neared, and we don't have to pay any penalties that will be our ultimate goal." Brown then responded, "Dennis said you probably will have to pay penalties—i.e. write a check to the IRS, but it will be made up in a subsequent deduction for 2007 and some enhancements to the insurance products if American General steps up to the plate." In the continued e-mail exchange, Mr. Choi stated that he was "expecting AG [American General] to step up to the plate to take care [of] the penalties. As you are aware, they sold this bad product to us without any legitimacy approval from the IRS, and have clients claimed all the tax deductions. That's really got us upset." Brown responded, "Dennis seemed very confident that American General will do the right thing,

---

[4] Defendants Brown and Roberson apparently referred plaintiffs to third parties Dennis Cunning and Pension Professionals of America to administer the 412(i) Plan and help respond to the IRS audit. Several documents that plaintiffs cite in support of their arguments on appeal, including those that were not timely submitted in opposition to the motion for summary judgment (see Discussion section II.C.1., *post*), include communications with Dennis Cunning.

6

but I don't want to be overly optimistic at this point. As you know, it's all hot air until it's in writing."

According to defendants, the Chois' knowledge of indeterminate damages due to the 412(i) Plan as of September 2007 was sufficient, under the relevant case law, to trigger the statute of limitations on all of plaintiffs' claims.

Plaintiffs opposed the motion for summary judgment on each of the asserted grounds, including the statute of limitations defense, and purported to dispute most of defendants' 32 material facts by citing their "Statement of Facts and Opposing Evidence Below Applicable to Motion Generally Nos. 33-105." They asserted that the November 2006 letter from the IRS merely informed them that the 412(i) Plan would be audited, and that a threat or possibility of damages is insufficient to complete the cause of action and trigger the statute of limitations. Rather, they contended that damages did not begin to accrue until at least 2009, when the audit and negotiations with the IRS concluded, and back taxes and penalties began to be assessed. For factual support, plaintiffs referenced their proffered, material facts Nos. 33-105 (comprising three volumes of evidence totaling about 1,000 pages).

The trial court issued a tentative ruling to grant defendants' motion for summary judgment on the statute of limitations defense. The court found that undisputed evidence showed plaintiffs "were on notice of the IRS penalties imposed on them no later than September 2007." Specifically, plaintiffs "were aware that the IRS would be seeking penalties and . . . were looking to others to cover those penalties." The court rejected plaintiffs' argument that damages did not accrue until completion of the audit in 2009. Citing the two-year and three-year statutes of limitations applicable to plaintiffs' causes of action, the court concluded that the action, filed in November 2010, was time-barred.

The trial court indicated that it also would grant American General's motion for summary judgment on the cross-complaint, since there was "no basis for liability against

7

defendants in the complaint, there [were] no triable issues of fact with respect to" defendants' claims for indemnity, contribution, and comparative fault.

Plaintiffs contested the tentative ruling. At the hearing, plaintiffs filed a notice of errata and requested leave to file a motion to amend their separate statement in opposition to defendants' summary judgment motion. The notice of errata sought to correct the inadvertent omission of two deposition exhibits from plaintiffs' evidence filed in support of their opposition. Plaintiffs' counsel explained that the omitted exhibits were a "key piece of evidence" showing that defendants, in their capacity as financial advisors, had advised plaintiffs to be patient and not file lawsuits because defendants' attorneys were optimistic about the audit and defendants were going to cover some lawyers' fees as well. He argued that plaintiffs should be allowed to submit additional evidence of communications between the Chois and defendants regarding the IRS audit and negotiations, to contravene defendants' assertion that the Chois were aware of damages in September 2007.

Regarding the statute of limitations defense, plaintiffs pointed out that the September 2007 e-mail did not confirm they would suffer damages, because Brown expressed hope that some or all penalties could be recaptured in 2007 deductions or covered by American General. More broadly, they argued that the limitations defense related only to the damages arising from tax penalties and the audit, whereas plaintiffs' claims encompassed other damages that accrued later. Plaintiffs objected that defendants' "very narrow motion should not dismiss everything else that's in the complaint."

The trial court rejected plaintiffs' attempt to introduce evidence and legal theories that were not included in the written opposition and explained that it would adopt its tentative ruling. The court's order granting summary judgment in favor of defendants and American General reflected the same reasoning set forth in the tentative, based on the conclusion that plaintiffs' action was time-barred. The court thus declined to address

defendants' objections to evidence or the other grounds raised in support of the summary judgment motion. The court entered judgment for defendants and against plaintiffs on August 21, 2014. The court simultaneously entered judgment for American General and against defendants as cross-complainants. Plaintiffs timely appealed the judgment against them on October 16, 2014. Defendants, as cross-complainants, appealed the judgment on that same day.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment is appropriate when there are no triable issues of material fact such that the moving party is entitled to judgment as a matter of law on all causes of action. (§ 437c; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618 (*Schachter*).)

We review an order granting summary judgment de novo, applying the same three-step analysis as the trial court. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860; *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1449 (*Pipitone*).) First, we identify the causes of action framed by the pleadings. Second, we determine whether the moving party has satisfied its burden of showing the causes of action have no merit because one or more elements cannot be established, or that there is a complete defense to that cause of action. Third, if the moving party has made a prima facie showing that it is entitled to judgment as a matter of law, the burden of production shifts and we review whether the party opposing summary judgment has provided evidence of a triable issue of material fact as to the cause of action or a defense. (§ 437c, subds. (o), (p)(2); *Pipitone*, *supra*, at p. 1449.) A party opposing summary judgment may not "rely upon the mere allegations or denials of its pleadings" but must set forth "specific facts" beyond the pleadings to show the existence of a triable issue of material fact. (§ 437c, subd. (p)(2).) The evidence must be viewed in the light most favorable to the nonmoving party. (*Schachter*, *supra*, 47 Cal.4th at p. 618.)

9

## B. GROUNDS FOR SUMMARY JUDGMENT

The trial court granted summary judgment based solely on the statute of limitations. Plaintiffs contend that the court erred, both as to its determination of *when* the statute of limitations began to run on plaintiffs' claims and as to *which* claims were affected. Defendants dispute plaintiffs' interpretation of when a cause of action accrues and argue that plaintiffs improperly rely on evidence and arguments that were not before the trial court.[5] Defendants further contend that the summary judgment was proper in any event, based on grounds raised in the motion that the trial court declined to address, and given plaintiffs' procedurally defective opposition. Plaintiffs respond that it would be error for this court to decide issues not considered by the trial court, including defendants' alternate grounds for summary judgment and the sufficiency of plaintiffs' responsive separate statement of material facts.

Because we will affirm the grant of summary judgment based solely on the statute of limitations, we need not address any alternate grounds argued in defendants' motion.[6] We note, however, that whether plaintiffs' responsive separate statement of material facts conformed to applicable rules is not beyond our immediate review. It is implicit in the trial court's finding that defendants "provided undisputed evidence" of the material facts

---

[5] We requested supplemental briefing on whether two legal theories raised in plaintiffs' opening brief had been forfeited and have considered the parties' responses in our analysis.

[6] If this court were to reach any of the grounds not relied upon by the trial court, section 437c, subdivision (m)(2) requires only that we "afford the parties an opportunity to present their views on the issue by submitting supplemental briefs." It does not mean this court cannot decide issues that were briefed for the trial court and addressed by both sides on appeal. (See, e.g., *Bains v. Moores* (2009) 172 Cal.App.4th 445, 471, fn. 39 [purpose of supplemental briefing "fully met" where the parties addressed alternative ground for summary judgment in response and reply briefs]; *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [" 'appellate court may affirm a summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court' "].)

supporting the statute of limitations defense that the court considered and rejected plaintiffs' dispute of those facts.  This is unsurprising, since plaintiffs purported to dispute defendants' material facts by referring the court generally to the voluminous body of opposing evidence.  Plaintiffs' responsive statement fell short of the requirement to follow each disputed material fact with "a reference to the supporting evidence" (§ 437c, subd. (b)(3); Cal. Rules of Court, rule 3.1350(f)(2), (3)), essentially leaving those facts uncontroverted.  (*California School of Culinary Arts v. Lujan*, *supra*, 112 Cal.App.4th at p. 22 [" 'Without a separate statement of undisputed facts *with references to supporting evidence in the form of affidavits or declarations*, it is impossible for the [opposing party] to demonstrate the existence of disputed facts.' " (italics added)]; *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 75 [It is the duty of the party opposing the summary judgment motion "to direct the court to evidence that supports their claims.  It is not the court's duty to rummage through the papers to construct or resuscitate their case"].)

## C. ANALYSIS

The crux of plaintiffs' claim on appeal is that the trial court erred in finding that the September 2007 e-mail exchange between Brown and the Chois apprised the Chois of damages based on IRS penalties.  Plaintiffs argue that the e-mail exchange, at most, put the Chois on notice that damages *might* occur in the future, depending on factors including the pending IRS audit, the offset of penalties with 2007 tax deductions, and the possibility that American General might cover certain costs.  Plaintiffs argue that the court's finding that plaintiffs were "on notice" of damages contravenes the principle that the possibility of future damages does not commence running of the statute of limitations.

Plaintiffs further argue that even if the September 2007 e-mail exchange constituted notice of damages, the court erred in failing to consider whether the fiduciary relationship between the Chois and defendants as their investment advisors tolled the statute of limitations or lessened plaintiffs' burden to discover the wrongful conduct.  In support of this argument—and for added context around the Chois' understanding of the

11

September 2007 e-mail—plaintiffs rely on late-filed evidentiary submissions that the trial court rejected. Plaintiffs also contend that the trial court erred in failing to determine whether knowledge of IRS penalties as of September 2007 triggered the statute of limitations as to each independent cause of action alleged in the complaint.

We first address plaintiffs' efforts to supplement the evidence and invoke legal theories that were not included in their written opposition to the motion for summary judgment. We then consider plaintiffs' statute of limitations arguments.

### 1. The Trial Court Did Not Abuse its Discretion in Refusing to Consider Plaintiffs' Tardy Submissions

On the day of the summary judgment hearing, plaintiffs sought to supplement the record with evidence to bolster their arguments opposing the statute of limitations defense. In a notice of errata, plaintiffs' counsel declared that two deposition exhibits had been inadvertently omitted. Counsel explained that the exhibits were not new evidence, because defendants had attended the deposition using those exhibits and had notice of their content based on plaintiffs' responsive separate statement.

Plaintiffs also requested leave to file a motion to amend their separate statement. They maintained that if the trial court was inclined to grant summary judgment on the statute of limitations issue, "[i]t would be gravely prejudicial to Plaintiffs to not consider evidence that highlights Defendants' continuing legal advice to Plaintiffs, as well as instructions not to pursue litigation. Plaintiffs' reliance on the advice of Defendants and Defendants' counsel to forbear litigation against Defendants tolls the statute of limitations."

The trial court refused both requests and rejected plaintiffs' legal arguments that relied on the late-filed evidence. The court observed that a "very substantial part of the argument presented this morning is based on a legal theory that's nowhere in the opposition. Defendants haven't heard it before. They haven't had a chance to think about it, to reflect on the facts on which the plaintiffs are relying, many of which were

12

not in the record until today, and the legal authorities that the plaintiffs are presenting now for the first time. [¶] So that is not appropriate." Plaintiffs filed objections to the denial of leave to amend and attached the excluded evidence, arguing that the additional evidence "would have further bolstered Plaintiffs' contention that a triable issue of fact existed in light of the Court's tentative ruling."

On appeal, plaintiffs rely in part on several of the late-filed exhibits and argue that the trial court "had discretion to and should have considered these additional documents." They suggest that since the statute of limitations argument "constituted a very small part" of the motion for summary judgment—comprising only one of five issues to be adjudicated—"it was not unreasonable" for plaintiffs to seek leave to introduce additional evidence bearing on that defense, given the trial court's tentative ruling. Yet plaintiffs cite no legal authority to support the contention that the court erred in refusing to consider the evidence and related arguments.

The exhibits appended to plaintiffs' notice of errata and motion to amend the responsive separate statement—filed on the day of the hearing—were untimely. A party must file and serve opposition to a motion for summary judgment "not less than 14 days" prior to the scheduled hearing, "unless the court for good cause orders otherwise." (§ 437c, subd. (b)(2).) Defendants point out that due to time extensions, plaintiffs had "approximately 221 days" to oppose the motion for summary judgment, far more than the prescribed period to file opposition under the statute. (*Id*., subds. (a)(2), (b)(2).) When pressed by the trial court to explain the tardy submissions, plaintiffs' counsel stated that "key" evidence in the notice of errata was omitted due to clerical error, and the evidence and arguments in the motion for leave to amend were "not in the brief" but were discussed "in a broad context as far as the allegations." He explained, "We're putting it before the Court today. . . . We didn't realize the Court would grasp on to [the statute of limitations issue]."

13

On this showing, we are not persuaded that the trial court erred. "Good cause must be shown to the satisfaction of the trial court before supplemental material may be filed after the statutory deadline . . . ." (*Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 624, disapproved on other grounds by *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019.) Furthermore, "case law has been strict in requiring good cause to be shown before late filed papers will be accepted." (*Hobson v. Raychem Corp.*, *supra*, at p. 625 [citing example in which counsel for the party opposing summary judgment was retained only one day before the hearing].) The trial court considered and rejected plaintiffs' requests to submit additional evidence, noting the failure to comply with statutory requirements and the unfairness to defendants. This was a proper exercise of the court's discretion. Accordingly, we reject plaintiffs' references to any of the late-filed evidence in support of their arguments on appeal.

### 2. The Statute of Limitations Period on Plaintiffs' Claims Commenced Upon Inquiry Notice of Wrongful Conduct Causing Damages

The thrust of plaintiffs' complaint is that defendants wrongly advised the Chois to establish the section 412(i) Plan despite known risks and increasing IRS scrutiny, causing plaintiffs to suffer financial losses, back taxes, and government penalties. Plaintiffs' claims sound in tort and are subject to a two- or three-year statute of limitations.[7] If the

---

[7] Plaintiffs contend that the trial court erred in considering any statute of limitations other than section 338, which defendants expressly cited in their answer. Plaintiffs are correct that a defendant who pleads the statute of limitations by reference to the statute must specify the section and, if applicable, particular subdivision(s). (§ 458; *Brown v. World Church* (1969) 272 Cal.App.2d 684, 691.) Failure to do so may waive the defense. (*Martin v. Van Bergen* (2012) 209 Cal.App.4th 84, 91.) Yet plaintiffs did not object to the defective pleading by demurrer or otherwise raise this argument before the trial court, either in opposition to the motion for summary judgment or by objection to the trial court's tentative ruling. While section 458 has been strictly construed, "[e]nforcement of that rule . . . depends upon the diligence with which the opposing party objects to the pleading defect by way of demurrer or otherwise." (*Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1086, fn. 5; *Davenport v. Stratton* (1944) 24 (continued)

14

trial court correctly determined that plaintiffs' notice of damages was sufficient as of September 2007 to assert their causes of action against defendants, then plaintiffs' November 2010 complaint was time-barred.

" 'Statute of limitations' is the collective term applied to acts or parts of acts that prescribe the periods beyond which a plaintiff may not bring a cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).) "A plaintiff must bring a claim within the limitations period after accrual of the cause of action." (*Ibid.*; see § 312.) "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' " (*Fox, supra,* at p. 806.) " ' " 'Ordinarily this is when the wrongful act is done and the obligation or the liability arises, but it does not "accrue until the party owning it is entitled to begin and prosecute an action thereon." ' " . . . In other words, '[a] cause of action accrues "upon the occurrence of the last *element essential to the cause of action.*" ' " ' " (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 316 (*Atlantic Richfield*), quoting *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 815.)

If the last element to occur in a tort action is damages, "the statute of limitations begins to run on the occurrence of 'appreciable and actual harm, however uncertain in amount,' that consists of more than nominal damages." (*San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1325-1326 (*SFUSD*); accord *Atlantic Richfield, supra,* 137 Cal.App.4th at p. 317; see, e.g., *Davies v. Krasna* (1975) 14 Cal.3d 502, 513 [in action for negligence, breach of duty " 'causing only nominal damages, speculative harm, or the threat of future harm—not yet realized' normally 'does

_____

Cal.2d 232, 247-248 [explaining waiver based on failure to raise the sufficiency of the plea by demurrer to the answer, or at trial]; see also *Corrigan v. Stiltz* (1965) 233 Cal.App.2d 381, 386 [noting it "was incumbent on" the party challenging the limitations bar "to object to the insufficiency of the sections pleaded either by demurrer to the answer or by timely objection at the trial"].) Plaintiffs may not now, for the first time on appeal, object to defendants' manner of pleading the statute of limitations defense.

not suffice to create a cause of action . . .' "].) It is "the *fact* of damage rather than the *amount* [that] is the relevant consideration" in determining the existence of "actual harm." (*Adams v. Paul* (1995) 11 Cal.4th 583, 589 (*Adams*).)

But a cause of action does not accrue, and the limitations period does not begin to run, "until the plaintiff discovers or should have discovered the cause of action." (*Atlantic Richfield*, *supra*, 137 Cal.App.4th at p. 317.) "Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." (*Fox*, *supra*, 35 Cal.4th at p. 807.) In ascertaining suspicion or knowledge of the elements of a cause of action, courts "do not take a hypertechnical approach . . . . Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid*.)

"The resolution of a statute of limitations defense is typically a factual question for the trier of fact. However, summary judgment is proper if the court can draw only one legitimate inference from uncontradicted evidence about the limitations issue." (*SFUSD*, *supra*, 37 Cal.App.4th at pp. 1325-1326; *Adams*, *supra*, 11 Cal.4th at p. 586 [determining when plaintiff suffered "manifest and palpable injury" generally raises a question of fact, but may be resolved as a matter of law if the material facts are undisputed].)

As previously noted, defendants relied on two exhibits for their statute of limitations defense: (1) the November 2006 letter from the IRS to Choice Instruments informing plaintiffs of specific defects in the 412(i) Plan and recommending that plaintiffs "unwind the plan and distribute the policies" or treat the Plan as subject to Internal Revenue Code section 412, and (2) the September 2007 e-mail between Brown and plaintiffs informing them that "there will be penalties . . . ." The parties primarily dispute the effect of the September 2007 e-mail.

16

Plaintiffs acknowledge that in the e-mail, Brown notified the Chois that the IRS intended to impose penalties on them. But they argue that when read in its entirety, the e-mail communicated Brown's expectation that some or all penalties would be recaptured in the Chois' 2007 deduction, and American General would offer to improve the insurance products in order to avoid financial loss to the Chois. Plaintiffs argue that Mr. Choi's response reflected these assurances, and the fact that penalties had not been assessed shows that damages remained uncertain, as did any indication that defendants had acted wrongfully. Plaintiffs posit that the September 2007 e-mail presented, at best, a triable issue of material fact regarding whether the Chois were "on notice" of actual and present damages, given speculation about the outcome of the IRS audit. Defendants respond that while the amount of damages was unknown, the September 2007 e-mail provides undisputed evidence that plaintiffs were aware of the existence of damages, which under well-established case authority completes the cause of action and triggers the limitations period.

Our resolution of this question turns on what constitutes notice of " 'appreciable and actual harm' " (*SFUSD*, *supra*, 37 Cal.App.4th at p. 1326) in the financial or investment advising context when the ultimate, financial outcome remains indeterminate even while the imposition of penalties appears certain. Viewing the September 2007 e-mail exchange in the light most favorable to plaintiffs (*Schachter*, *supra*, 47 Cal.4th at p. 618), we nevertheless conclude that plaintiffs had "reason to at least suspect" that defendants' advice to establish the 412(i) Plan, weighted toward life insurance and dependent on deductions and features like "springing" cash values, had harmed them. (*Fox*, *supra*, 35 Cal.4th at p. 807.) Our conclusion traces the case law addressing when the injury element of a tort cause of action is complete, causing the cause of action to accrue and the limitations period to commence.

We begin with *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606 (*Feddersen*), in which the California Supreme Court adopted a bright-line

17

rule for determining the timing of actual injury in an accountant malpractice action. *Feddersen* held that "*actual injury*, caused by an accountant's negligent filing of tax returns" occurs when "the IRS actually *assesses* the tax deficiency." (*Id*. at p. 608.) The court explained that based on IRS procedures for the examination of tax returns and assessment of deficiencies, findings prior to the penalty assessment "are merely *proposed* findings, subject to review and negotiation." (*Id*. at p. 609.) While noting that other "palpable harm caused by the malpractice of the accountant" might accrue prior to finalization of the audit, the court reasoned that such harm would be "based on a *tentative* assessment of *potential liability* only" and thus would not constitute "actual harm until the date of the deficiency tax assessment or finality of the audit process." (*Id*. at p. 620.)

Plaintiffs argue that because the September 2007 e-mail informed the Chois that the IRS audit was ongoing and the amount of penalties and any potential offset were unknown, the reasoning of *Feddersen* should apply here. Plaintiffs maintain that there is no principled basis to distinguish between applying the statute of limitations in the context of IRS audit proceedings caused by negligent tax preparation and identical proceedings caused by faulty investment advice. Similar attempts to apply *Feddersen* in non-tax preparation cases, however, have been rejected by subsequent case authority.

For example, in *Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, this court examined the limits of *Feddersen*'s application in another accounting malpractice scenario. The court observed that "[t]he Supreme Court has subsequently (in a legal malpractice case) stated that *Feddersen* involved 'very narrowly drawn circumstances' and 'did not articulate a "rule for all seasons." ' " (*Id*. at p. 718, quoting *Adams*, *supra*, 11 Cal.4th at p. 588.) The high court reiterated this view in *Jordache Enterprises*, *Inc. v. Brobeck*, *Phleger & Harrison* (1998) 18 Cal.4th 739, 763 (*Jordache*), stating that

18

"*Feddersen* presented specialized circumstances and did not articulate a rule of broad or general applicability."[8]

Other Court of Appeal decisions reflect the consensus that *Feddersen*'s bright-line rule applies to accounting malpractice actions for the negligent preparation of tax returns. In *Apple Valley Unified School Dist. v. Vavrinek, Trine, Day & Co.* (2002) 98 Cal.App.4th 934 (*Apple Valley*), the court deemed it unsurprising that "subsequent decisions have given *Feddersen*'s bright-line holding only narrow application," since *Feddersen* "based its holding not on a conclusion that no actual injury occurs until there is a final IRS assessment, but on its determination that in the context of negligent tax return preparation, the need for uniformity overrides the usual considerations that dictate when the statute of limitations should be deemed to commence." (*Apple Valley*, *supra*, at p. 945.) *Apple Valley* involved an accounting malpractice action in which the plaintiff school district claimed that misrepresentations in the defendant accountants' audit report had induced it to improperly provide state funds to a charter school. (*Id*. at p. 937.)

---

[8] In fact, *Jordache* expressly overruled an earlier Supreme Court decision—also involving legal malpractice—that *Feddersen* relied on by analogy in identifying when a client suffers "actual injury" in the context of an accountant's negligent preparation of income tax returns. (*Jordache*, *supra*, 18 Cal.4th at pp. 762-763 [explaining that the "broad, categorical rule" for accrual of an attorney malpractice cause of action articulated in *ITT Small Business Finance Corp. v. Niles* (1994) 9 Cal.4th 245 "cannot be reconciled with the particularized factual inquiry required to determine actual injury under" the limitations statute for legal malpractice actions].) In *Feddersen*, the court examined the evolution of the "discovery plus actual injury" (*Feddersen*, *supra*, 9 Cal.4th at p. 615) requirement in professional malpractice actions and relied in substantial part on *ITT*, explaining that "the assessment of the tax deficiency is the equivalent of the settlement [of underlying litigation] in *ITT*, because the question whether the taxpayer suffered actual injury as a result of the accountant's allegedly negligent preparation of the tax returns is contingent on the outcome of the audit." (*Id.* at p. 619.) Despite *Feddersen*'s reliance in part on *ITT*, the court in *Jordache* refrained from directly questioning *Feddersen*'s holding. (See *Jordache*, *supra*, at p. 764, fn. 10 [because *Feddersen* arose under a different limitations provision and was not directed at legal malpractice actions, "we have no occasion in this case to reexamine *Feddersen*'s rationale or rule"].)

19

The trial court granted the defendants' demurrer based on the statute of limitations, finding that the school district became aware of the illegal charter school and suffered actual injury when it hired an accountant and attorney at or about that time. (*Id*. at pp. 941-942.) On appeal, the school district contended in part that it did not suffer actual injury until over two years later, when the state controller issued a report holding it responsible for overpayments to the charter school; it urged that any liability for overpayments before that time "was merely speculative and could not constitute actual injury." (*Id*. at p. 944.)

After a detailed review of California Supreme Court and appellate court jurisprudence on when professional negligence causes actual injury, the court elected not to extend the *Feddersen* rule to the accountants' alleged, negligent misrepresentation. (*Apple Valley*, *supra*, 98 Cal.App.4th at pp. 944-947.) Rather, the court reasoned that the fact-specific inquiry articulated in *Jordache* for the timing of injury in a legal malpractice action "should apply except to cases which fall within *Feddersen*'s narrow holding governing negligent tax return preparation." (*Id*. at p. 952.) Applying the *Jordache* analysis of actual injury based on "whether the plaintiff has sustained damages compensable in a malpractice action" (*id*. at p. 948), the court affirmed the trial court's finding that the district "suffered actual injury when it recognized the allegedly improper apportionment payments to [the charter school] and incurred expenses in an attempt to determine the extent of the improper conduct." (*Id*. at p. 953.)

In *Van Dyke v. Dunker & Aced* (1996) 46 Cal.App.4th 446, 448 (*Van Dyke*)—an accountant malpractice action based on erroneous income tax advice—the court similarly concluded that *Feddersen*'s bright-line rule for cases based on negligent preparation of tax returns "does not apply here." The plaintiffs in *Van Dyke* allegedly relied on the defendant accountant's advice that donating a parcel of property to charity would offset their tax liability via a " 'dollar-for-dollar' tax credit for the fair market value of the land donated." (*Id*. at p. 449.) The accountant later informed them that he had made a

20

mistake about the tax credit and instead the plaintiffs would only get a tax deduction spread out over several years. (*Ibid.*) The plaintiffs paid taxes based on the deduction but filed suit only a few years later, after another accountant reviewed the returns, discovered errors resulting in overpayment, and negotiated with the IRS for a partial refund. (*Id.* at p. 450.) The trial court granted summary judgment for the defendants, finding that the statute of limitations began to run when the accountant informed the plaintiffs of his mistake and their resulting tax liability. (*Id.* at pp. 450, 452.)

On appeal, the *Van Dyke* plaintiffs argued that their cause of action did not accrue until the completion of negotiations, when the IRS "finally determined" their tax obligations. (*Van Dyke*, *supra*, 46 Cal.App.4th at p. 452.) In declining to apply *Feddersen*, the court explained: "The propriety of the tax advice [the plaintiffs] received . . . was not contingent on the outcome of the IRS audit. There was nothing speculative about the damages they suffered in 1991 as a result of the alleged erroneous advice regarding the benefits of donating their property to a charitable organization. The determination by the IRS in 1994 regarding [the plaintiffs]' 1990 tax liability merely resolved the extent of their loss." (*Id.* at p. 455.) Comparing the injury in *Van Dyke* to the immediate " 'loss of a right, remedy, or interest, or in the imposition of a liability' " in cases where the plaintiff entered into an unfavorable agreement due to poor legal advice, the court explained that " 'there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred.' " (*Id.* at p. 457.)

Plaintiffs offer no persuasive justification to depart from *Apple Valley*, *Van Dyke*, and the Supreme Court's own authority, including *Adams* and *Jordache*—all cases that rejected proposals to extend *Feddersen*'s bright-line rule for determining "actual injury" to claims based on conduct other than the negligent preparation of tax returns. Moreover, plaintiffs' argument that commencement of the statute of limitations in the context of IRS audit proceedings related to faulty investment advice need not differ from the context of

21

audit proceedings related to negligent tax preparation obscures a key difference: whether actual injury is contingent on the outcome of the IRS audit process. It may be that actual injury results from an accountant's allegedly negligent preparation of tax returns only as determined by an IRS audit (*Feddersen*, *supra*, 9 Cal.4th at p. 619), but the same cannot be said for more wide-ranging categories of negligent tax-related or investment advice. (See, e.g., *Van Dyke*, *supra*, 46 Cal.App.4th at p. 455 [propriety of tax advice and resulting injury not contingent on outcome of IRS audit].)

Because *Feddersen*'s bright-line rule does not dictate when the statute of limitations began to run on plaintiffs' causes of action in this case, our determination is governed by the general rules articulated in *Jordache* and later in *Fox*, and applied in *Apple Valley* and *Van Dyke*. Plaintiffs do not seriously dispute that they had reason to suspect negligent conduct causing loss or damage as of the September 2007 e-mail exchange, but contend that the damage had not manifested and any anticipated damages were too uncertain and speculative to constitute actual injury. (See *Apple Valley*, *supra*, 98 Cal.App.4th at p. 942 [statute of limitations "begins to run when (1) the aggrieved party discovers the negligent conduct causing the loss or damage and (2) the aggrieved party has suffered actual injury as a result of the negligent conduct"].)

Certainly, as of the September 2007 e-mail, plaintiffs "discover[ed] or should have discovered" (*Atlantic Richfield*, *supra*, 137 Cal.App.4th at p. 317) that defendants' advice had led them to trouble. The November 2006 notice from the IRS informed them of significant "defects"[9] in the 412(i) Plan that defendants had advised them to establish and

---

[9] The listed defects identified those characteristics of the Plan that plaintiffs allege defendants represented would bring them substantial financial value and were " 'bullet proof.' " The IRS identified the defects as "1. Listed Transaction under Revenue Ruling 2004-20 [¶] 2. Springing Cash Values [¶] 3. Exchange Rights for a policy with higher value [¶] 4. Values provided by the contracts significantly exceed amounts needed for benefits under the Plan (including IRC 415) [¶] 5. Excessive surrender/expense charges [¶] 6. No separate agreement for flexible premium deferred annuity contracts [¶] (continued)

recommended that they "unwind the plan and distribute the policies" or treat it as a 412 Plan. The September 2007 e-mail informed the Chois that there would be IRS penalties but reflected cautious optimism that the penalties would be offset in other ways, including a deduction and "some kind of favorable offer" if American General "steps up to the plate." Mr. Choi responded, "I am expecting [American General] to step up to the plate to take care [of] the penalties. As you are aware, they sold this bad product to us without any legitimacy approval from the IRS, and have clients claimed all the tax deductions. That's really got us upset."

Contrary to plaintiffs' assertion that "there was no certainty" that the Chois "knew of Defendants' wrongful acts," this exchange satisfies the requirement under the discovery rule that "[a] plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' " (*Fox*, *supra*, 35 Cal.4th at p. 807.) Based on Mr. Choi's response to Brown, plaintiffs recognized that the policies they bought under the 412(i) Plan were compromised and would require payment of penalties—though they hoped and insisted that they would not have to pay. Given that the defects in the 412(i) Plan identified by the IRS directly matched those elements of the Plan that were supposed to generate a high cash value, confirmation the following year that the IRS would impose penalties was more than adequate to trigger suspicion not only regarding the impending penalties, but regarding the promised benefits of the 412(i) Plan.

Generally, once plaintiffs "have reason to at least suspect that a type of wrongdoing has injured them," the cause of action begins to accrue. (*Fox*, *supra*, 35 Cal.4th at p. 807.) The plaintiffs at that point "are required to conduct a reasonable investigation . . . , and are charged with knowledge of the information that would have been revealed by such an investigation." (*Id*. at p. 808.) There is no indication that the

7. Non-level premiums [¶] 8. Benefits provided by the contracts are not equal to the benefit provided by the plan under one or more forms."

23

duty to investigate applies differently when the element in question is that of damages, or more specifically, the extent thereof.  It is often repeated that "the limitations period begins once the plaintiff ' " 'has notice or information of circumstances to put a reasonable person on *inquiry* . . . .' " '  [Citations.]  A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery.  Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights.  So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 (*Jolly*).)

Here, plaintiffs were aware of facts that should have put them on *inquiry notice* of the cause or causes of action arising from defendants' investment advice.  (*Jolly*, *supra*, 44 Cal.3d at pp. 1110-1111; *Fox*, *supra*, 35 Cal.4th at p. 807.)  Specifically as to " 'appreciable and actual harm' " (*Jordache*, *supra*, 18 Cal.4th at p. 748) or the " 'actual injury' " (*ibid.*) element of the tort cause of action, "the fact of damage, not the amount" serves as the relevant metric.  (*Id.* at p. 743; *Adams*, *supra*, 11 Cal.4th at p. 589.)  As defined in *Jordache*, "[a]ctual injury refers only to the legally cognizable damage necessary to assert the cause of action." (*Jordache*, *supra*, at p. 752.)

The IRS's notice to plaintiffs in November 2006 of numerous defects in their 412(i) Plan and the need to unwind or otherwise alter the Plan structure raised suspicion about plaintiffs' ability to realize the promised value of their insurance investments.  The September 2007 e-mail certainly indicated "legally cognizable damage" (*Jordache*, *supra*, 18 Cal.4th at p. 752) in the form of IRS penalties, which appeared certain even while the ultimate financial impact was unknown.  This went beyond "speculative and contingent injuries," which "are those that do not yet exist, as when an attorney's error creates only a potential for harm in the future." (*Id.* at p. 754.)  Brown's inability to provide "exact numbers" and hedging on whether the penalties would be "recaptured" in a deduction or potentially "offset" by American General did not consign the fact of

24

damages to that of potential future harm not yet realized. Rather, the evidence shows that the propriety of defendants' advice regarding the 412(i) Plan, and the fact of damages, were ascertainable, even if "future events" might have affected the permanency of the injury "or the amount of monetary damages eventually incurred." (*Ibid.*)

We recognize that defendants did not show that plaintiffs had incurred calculable damages as of September 2007. On that basis, plaintiffs contrast their circumstances upon learning of impending IRS penalties with the "actual injury" in *Van Dyke*, which as noted earlier, accrued when the plaintiffs transferred their property based on the accountant's faulty advice and were assessed higher taxes than expected. (*Van Dyke*, *supra*, 46 Cal.App.4th at p. 455.) Plaintiffs argue that *Van Dyke* supports a finding of no actual injury here, because no penalty assessment or tax had yet occurred. The facts in *Apple Valley* could support a similar argument, insofar as the school district had already paid state apportionment funds to the charter school and later incurred out-of-pocket losses by paying investigation and legal fees. (*Apple Valley*, *supra*, 98 Cal.App.4th at pp. 946-947.)

However, by the time plaintiffs learned that the IRS's adverse assessment of the 412(i) Plan would result in penalties, neither the lack of a numeric assessment nor the hope of offset by another source negated the fact that plaintiffs were on notice of actual injury. Not only had plaintiffs already invested substantial money into the program, but Brown told them they would have to pay IRS penalties, and the IRS had notified them that the 412(i) Plan components promising springing cash value and exchange rights for a higher-value policy were defective. As the Supreme Court reiterated in *Jordache*, " '[t]he mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence.' " (*Jordache*, *supra*, 18 Cal.4th at p. 750.) But "the existence of appreciable actual injury does not depend on the plaintiff's ability to attribute a quantifiable sum of money to consequential damages." (*Ibid.*)

25

Plaintiffs' reliance on *SFUSD*, *supra*, 37 Cal.App.4th 1318, is misplaced because the distinction in that case between the *threat* of future harm and *appreciable harm* forming the damages element of the strict liability or negligence cause of action rested on the unique nature of the harm at issue—that of asbestos contamination in buildings. (*Id.* at p. 1330 ["Physical injury resulting from asbestos contamination, not the mere presence of asbestos, must have occurred before a cause of action for strict liability or negligence can accrue in an asbestos-in-building case"].) By contrast, plaintiffs' economic investment in the 412(i) Plan was subject to actual and appreciable harm once the IRS assigned defects to the Plan and plaintiffs learned they would be subject to penalties. As between "an actual, existing injury that might be *remedied or reduced* in the future, and a speculative or contingent injury that might or might not *arise* in the future" (*Jordache*, *supra*, 18 Cal.4th at p. 754), the former applies here. The Chois knew they were being injured in some amount but aspired for a remedy or reduction to the injury through a third-party representative's negotiations with the IRS and potential remedial changes to the American General policies. We conclude under these circumstances that plaintiffs had knowledge of harm to their financial interest sufficient to trigger inquiry notice and to support a legally cognizable claim for damages.

### 3. *The Statute of Limitations Period Was Not Tolled While Plaintiffs and Defendants Cooperatively Challenged the IRS Assessment of the Plan*

Plaintiffs contend that even if the September 2007 e-mail constituted notice of actual damages, causing the action to accrue, longstanding tolling rules applicable to professions including lawyers and doctors dictate that the statute of limitations does not run in favor of a fiduciary while the fiduciary relationship continues. Plaintiffs urge us to apply the rule here, where defendants continued to advise and advocate on behalf of the Chois during the IRS audit of the 412(i) Plan. Plaintiffs argue that the trial court erred in failing to consider the continuing relationship between plaintiffs and defendants while they cooperatively sought to defeat or minimize IRS penalties. Defendants respond that

26

plaintiffs improperly seek to raise this argument for the first time on appeal. They argue that even if a fiduciary relationship existed between plaintiffs and defendants, no legal authority supports plaintiffs' contention that the statute of limitations was tolled while the parties cooperatively tried to minimize plaintiffs' damages.

We note that although plaintiffs did not raise the tolling argument in their opposition papers before the trial court, their counsel argued at the hearing that defendants "are estopped from claiming statute of limitations." (See *Brown v. Bleiberg* (1982) 32 Cal.3d 426, 438 [noting "the rationale of the tolling doctrine is estoppel"].) In support, counsel cited certain exhibits purporting to show defendants reassuring the Chois, before and after September 2007, that they should not act on or worry about the IRS audit, since Pension Professionals and their lawyers were fighting the IRS on plaintiffs' behalf.[10] The trial court, as explained *ante*, refused to consider the argument and cases that were not in plaintiffs' opposition papers, deeming it unfair to defendants.

An appellate court ordinarily "will not consider an argument 'raised in an appeal from a grant of summary judgment . . . if it was not raised below and requires consideration of new factual questions.' " (*Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 335 (*Noe*); *Winchester Mystery House, LLC v. Global Asylum, Inc.*

---

[10] One of the exhibits cited by plaintiffs' counsel appears to support our earlier conclusion that plaintiffs were subject to actual and appreciable harm as of September 2007. (See *ante*, Discussion section II.C.2.) The evidence shows that plaintiffs, in August 2006, agreed to pay a $5,000 retainer and share up to a maximum of $12,500 in additional legal fees with Pension Professionals to defend against the IRS audit, constituting another form of cognizable legal damages caused by establishment of the 412(i) Plan. (See *Apple Valley*, *supra*, 98 Cal.App.4th at p. 949 [finding the school district's "out-of-pocket expenses . . . incurred when it engaged its accountant and legal counsel, in an effort to determine the extent of the improper payments and arrange for reimbursement of funds improperly received, constituted actual injury for limitations purposes"]; *Jordache*, *supra*, 18 Cal.4th at p. 761 [noting that the defendant's "neglect required [the plaintiff] to pay defense costs in the Marciano action for years and to lose investment opportunities for those funds"].)

27

(2012) 210 Cal.App.4th 579, 594-595 (*Winchester*).)  But we may "consider a newly raised issue 'when [it] involves purely a legal question which rests on an uncontraverted record which could not have been altered by the presentation of additional evidence.' " (*Noe*, *supra*, at p. 335.)  To the extent that plaintiffs' tolling argument raises a purely legal question and has been briefed by both sides on appeal, we may consider it.  We decline, however, to consider any disputed factual issues that were not properly before the trial court, including evidence that plaintiffs sought to add to the record on the day of the summary judgment hearing.  (*Winchester*, *supra*, at pp. 594-595 [finding plaintiff had forfeited theory on appeal that was not argued to the trial court and required application of a legal test employing a series of factual determinations].)

Plaintiffs propose that so long as a financial advisor continues to advise the client or represent the client's interest in the transaction that gives rise to legal claims, the action should be tolled until the advisor-client relationship has terminated.  Plaintiffs concede there is no specific statutory tolling provision for financial advisors, but argue the rationale behind tolling in analogous circumstances applies equally here.  For example, the statute of limitations in an attorney malpractice action is tolled while "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred."  (§ 340.6, subd. (a)(2).)

In other cases, a confidential or fiduciary relationship between a defendant and a plaintiff will toll the statute of limitations.  (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1597 (*Amtower*); see *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 596 [explaining postponement of accrual in cases "where a fiduciary obligation is involved," including actions against trustees, agents, accountants, and physicians].)  The rationale is that "such relationships carry a duty of full disclosure and delaying accrual of the statute 'prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure.' "  (*Amtower*, *supra*, at p. 1597, quoting *Neel v. Magana, Olney, Levy*,

28

*Cathcart & Gelfand* (1971) 6 Cal.3d 176, 189.) For similar reasons, a defendant's alleged fraud in concealing a cause of action may toll the statute of limitations "for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99.) Still in other contexts, courts recognize the effect of a continuing fiduciary relationship not by tolling the statute of limitations, but by applying a reduced burden of discovery on the beneficiary. (*Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 324 [insider-promotor selling limited partnership interest to subscriber " '*is entitled to rely upon the assumption that his fiduciary is acting in his behalf* "].)

Plaintiffs assert that the relationship between a client and financial planner or investment advisor is fiduciary as a matter of law (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 140)—a proposition that defendants do not contradict and we accept for the purpose of considering plaintiffs' argument.[11] While plaintiffs did not allege tolling of the statute of limitations, the argument is framed by the allegation in the complaint that defendants concealed and failed to disclose known risks as IRS scrutiny of the 412(i) Plans progressed, while attributing any fault to American General. Still, plaintiffs' contention fails as a matter law for the reason previously stated: plaintiffs were on inquiry notice as of September 2007 of the facts constituting injury and indicating they had received bad advice. Delayed accrual due to the fiduciary relationship does not

---

[11] Fiduciary duties may be imposed by law, as in " 'certain technical, legal relationships such as . . . trustees and beneficiaries, principals and agents, and attorneys and clients,' " or may be determined as a question of fact, based on the nature of the confidential relationship that gives rise to a fiduciary duty under common law. (*Hasso v. Hapke*, *supra*, 227 Cal.App.4th at p. 140 [referring to the investment advisor-client relationship as fiduciary by law].) The statutory definition of investment advisor "also includes any person who uses the title 'financial planner' . . ." and engages in the business of advising others about investing in securities. (Corp. Code, § 25009, subd. (b).)

extend beyond the bounds of the discovery rule, which operates to protect the plaintiff who " 'despite diligent investigation . . . is blamelessly ignorant of the cause of his injuries' " and should not be barred from asserting a cause of action for wrongful conduct " 'before he could reasonably be expected to discover its existence.' " (*E-Fab*, *Inc*. *v*. *Accountants*, *Inc*. *Services* (2007) 153 Cal.App.4th 1308, 1318 (*E-Fab*).)

Here, the only conclusion to be drawn from the evidence leading up to and including the September 2007 e-mail is that plaintiffs were not shielded from the knowledge that the IRS was questioning the validity of 412(i) Plan, had identified multiple defects that would require unwinding or conversion to another type of plan, and had informed Cunning of forthcoming penalties. Plaintiffs, in fact, had agreed in August 2006 to share the legal costs of defending against the IRS actions. Like in *Amtower*, in which we declined to apply the tolling principles to a scenario in which the defendants had "disclosed the facts necessary to support" the plaintiff's cause of action (*Amtower*, *supra*, 158 Cal.App.4th at p. 1597), we find that even assuming a fiduciary relationship between defendants and plaintiffs, plaintiffs as of September 2007 were aware of the facts necessary to support their causes of action. We conclude that the nature of the relationship between plaintiffs and defendants did not prevent or delay the Chois from discovering wrongdoing beyond September 2007.

### 4. *Accrual of the Statute of Limitations Was Not Limited to a Single Cause of Action or Damages Claim*

Plaintiffs challenge the trial court's application of the statute of limitations to bar the entire action. They assert that they suffered "several different injuries arising out of multiple instances of poor investment advice," each of which represents an invasion of a different primary right and constitutes a separate cause of action. Plaintiffs argue that because each injury alleged in the complaint is distinct and arises from separate, bad advice, defendants failed to meet their initial burden on summary judgment by showing that each distinct cause of action was barred by the limitations defense.

Like the tolling argument, this legal theory appears fully developed for the first time on appeal. Plaintiffs' written opposition to the summary judgment motion mentions nothing about causes of action left unaddressed by the defendants' motion, although plaintiffs' counsel did attempt to argue that point at the hearing. He maintained that defendants took "a very simplistic and narrow view of the case" and ignored "a substantial part of the complaint and various allegations," thereby failing to meet their prima facie burden "to dispose of an entire cause of action and not just to laser focus in on tax advice and tax penalties." These arguments go to the heart of defendants' initial burden as the party moving for summary judgment to show that each cause of action, "even if not separately pleaded," had no merit or was barred by a complete defense. (§ 437c, subd. (p)(2).) Consequently, we address the purely legal issue for the first time on appeal. (*Winchester*, *supra*, 210 Cal.App.4th at pp. 594-595.)

As a general proposition, plaintiffs are correct that under California's "primary right" theory of code pleading, we determine the causes of action alleged in the complaint "based on the injury to the plaintiff, not on the legal theory or theories advanced to characterize it." (*Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1364 (*Skrbina*); accord *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681-682 (*Crowley*).) "Thus, if a plaintiff states several purported causes of action which allege an invasion of the same primary right he has actually stated only one cause of action. On the other hand, if a plaintiff alleges that the defendant's single wrongful act invaded two different primary rights, he has stated two causes of action, and this is so even though the two invasions are pleaded in a single count of the complaint." (*Skrbina*, *supra*, at p. 1364.)

In support of their argument that the statute of limitations defense narrowly addressed injury only in the form of IRS penalties, plaintiffs seek to differentiate each iteration of alleged harm and relate it to a different injury or primary right. For example, they contend they were first damaged "based upon the advice regarding deductibility" when they converted their 412(i) Plan to a traditional 412 Plan and had to pay additional

31

excise tax because the deductions previously taken were not deductible under the 412 Plan. They contend that they were separately damaged by defendants' incorrect advice about the need to file a form 8886 with their 2004 and 2005 tax returns—resulting in IRS penalties, and by advice that they would have an "irrevocable contractual right" to purchase certain universal life policies in year eight of the program—resulting in the loss of promised benefits when the policies were not available, and by advice to buy new life insurance policies for the converted 412 Plan—resulting in a loss when those policies were liquidated, and so on.

We are not persuaded by this piecemeal interpretation of injury post hoc. "The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action." (*Crowley*, *supra*, 8 Cal.4th at p. 681.) It is, simply put, "the plaintiff's right to be free from the particular injury suffered." (*Ibid*.) Viewed in these terms, " 'a cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty." (*Ibid*.) The gravamen of plaintiffs' action as framed by the complaint in this case was that defendants advised plaintiffs to establish and fund a section 412(i) Plan with tax shelter features that, unsurprisingly, triggered IRS penalties, back taxes, and required conversion to a traditional 412 Plan, causing further economic losses due to disallowed deductions and lost insurance policy benefits. Each claimed injury traces to, and is not distinct from, the same source of wrongful conduct—namely defendants' bad advice concerning establishment of the 412(i) Plan and purchase of the life insurance policies. The fact that plaintiffs pleaded multiple legal theories of recovery, and that damages accrued in stages, does not transform one primary right into many. "The manner in which a plaintiff elects to organize his or her claims within the body of the complaint is irrelevant to determining the number of causes of action alleged under the primary right theory." (*Hindin v. Rust* (2004) 118 Cal.App.4th 1247, 1257 (*Hindin*).)

Even more to the point, application of plaintiffs' theory would be somewhat novel here, given that the "primary right theory has a fairly narrow field of application" most commonly invoked "when a plaintiff attempts to divide a primary right and enforce it in two suits." (*Crowley*, *supra*, 8 Cal.4th at p. 682.) While we understand by analogy plaintiffs' attempt to show distinct damages due to separate instances of poor advice alleged in the complaint (*id*. at p. 684 [court "not averse to drawing analogies from the primary right theory when appropriate"]), plaintiffs' claims are not divisible under the rubric proposed. If, hypothetically, plaintiffs had sought to enforce their purportedly distinct claims for damages in separate law suits (such as by alleging negligence in one suit and fraud in a second suit, or by alleging negligent advice regarding the section 412(i) Plan in one suit and regarding conversion to the 412 Plan in the second suit), the likely outcome would be a plea in abatement (if the first suit remained pending) or a defense of res judicata (if the first suit had terminated on the merits). (*Crowley*, *supra*, at p. 682; see, e.g., *Johnson v. American Airlines, Inc*. (1984) 157 Cal.App.3d 427, 432-433 [state court action was barred by previous federal class action because the primary right allegedly violated—to be free from employment discrimination based on sex—was the same in both cases, even though the federal action alleged federal civil rights violations while the state action alleged violations of the California Constitution and state statutes].)

Plaintiffs' citations to case authority do not suggest otherwise, but offer some guidance on assessing distinct and separate claims. In *E-Fab*, *supra*, 153 Cal.App.4th 1308, the court addressed circumstances in which claims against the defendant accrued at a different time than claims against a former employee. The plaintiff was the victim of embezzlement by the employee; the defendant accounting agency had recruited and placed the employee with plaintiff upon representing that it had screened her background, credentials, and references. (*Id*. at pp. 1313-1314.) In reviewing the grant of demurrer on statute of limitations grounds, the court recognized that "the accrual trigger" for the case against the defendant agency was the plaintiff's discovery that it had misrepresented

33

the employee's record and qualifications, not earlier notice of the employee's fraud. (*Id.* at p. 1323.)

In *Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 792 (*Pooshs*), the California Supreme Court held that a later-discovered physical injury caused by tobacco use can be considered separate and distinct from an earlier-discovered physical injury, for statute of limitations purposes, but expressly confined its holding to "latent disease cases, without deciding whether the same rule should apply in other contexts." The court distinguished latent disease like the plaintiff's lung cancer from earlier-occurring disease like the plaintiff's COPD based on the showing—accepted as true given the procedural posture—" 'that COPD is a separate illness, which does not pre-dispose or lead to lung cancer and that it has nothing medically, biologically, or pathologically to do with lung cancer.' " (*Id.* at p. 802.) Given the separate and distinct nature of the later-occurring injury, the court drew on its reasoning in an earlier decision which held that appreciable harm from tobacco addiction in the form of *economic injury* (i.e., cost of purchasing cigarettes) did not begin the running of the statute of limitations on a suit to recover damages for *physical injury* (i.e., emphysema and periodontal disease) later resulting from that addiction. (*Id.* at p. 799, citing *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 643-646.)

Finally, in *Hindin*, *supra*, 118 Cal.App.4th at pages 1258 through 1259, the court determined that the trial court had improperly granted summary adjudication where the action for malicious prosecution asserted only a single cause of action, based on a single primary right, even though the underlying lawsuit breached that primary right in two ways. In contrast, the court in *Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110, 1116-1118 (*Fineman*), determined that each of 23 unauthorized checks paid by the defendant bank constituted a "separate and distinct alleged obligation or claim" (*id.* at p. 1118) for purposes of summary adjudication, even though the plaintiff's complaint aggregated the 23 claims into a single cause of action.

34

As applied here, *Hindin* is inapposite, because this case is not a malicious prosecution action in which the underlying litigation involved different primary rights. *Fineman* and *E-Fab* are distinguishable based on the nature of the claims at issue. Whereas in *Fineman*, the processing of each fraudulent check represented "a separate and distinct wrongful act" that could be assessed independently as a separate cause of action (*Fineman*, *supra*, 66 Cal.App.4th at p. 1118), the different manifestations of injury in this case represent an ongoing series of consequences all traceable to the same underlying bad advice. In *E-Fab*, the nature of the respective claims required the court "to segregate [the] plaintiff's claims against its employee . . . from its claims against [the] defendant, recognizing that each may accrue at a different time." (*E-Fab*, *supra*, 153 Cal.App.4th at p. 1322.) In contrast, because the series of injuries claimed in this case all trace to the same underlying conduct committed by the same defendants, there is no basis to assign a later accrual date once plaintiffs had " '*reason to suspect an injury and some wrongful cause . . . .*' " (*Id.* at p. 1319; *Fox*, *supra*, 35 Cal.4th at p. 803.) To the extent that the narrow holding in *Pooshs* has any application here, we note that unlike a plaintiff who develops one disease but has no reason to suspect the future occurrence of a still-latent disease (*Pooshs*, *supra*, 51 Cal.4th at p. 802), plaintiffs' knowledge that the IRS would issue penalties under the section 412(i) Plan and had recommended unwinding the Plan or converting to a traditional 412 Plan provided ample reason to suspect and investigate other inevitable economic consequences.

In sum, our conclusion that the statute of limitations began to run on plaintiffs' causes of action as of September 2007 extends to all claims arising from the allegations that defendants improperly induced the Chois into establishing the 412(i) Plan and funding it in a manner that was bound to trigger IRS scrutiny. The trial court consequently did not err in finding that plaintiffs' action was time-barred.

## III.   DISPOSITION

The judgment is affirmed as to defendants and cross-appellants Richard Brown, Matthew Roberson, Sagemark Consulting, Lincoln Financial Advisors, and Lincoln National Corporation, and as to cross-defendant and respondent American General.

Each side shall bear its own costs on appeal.

_____

Premo, Acting P.J.

WE CONCUR:

_____

Mihara, J.

_____

Grover, J.

Choi et al. v. Sagemark Consulting et al.
H041569

Filed 12/11/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| NELSON CHOI et al., | H041569 |
| | (Santa Clara County |
| Plaintiffs and Appellants, | Super. Ct. No. 1-10-CV187143) |
| | |
| v. | ORDER FOR PUBLICATION |
| | |
| SAGEMARK CONSULTING et al., | |
| | |
| Defendants, Cross-complainants and Appellants; | |
| | |
| AMERICAN GENERAL LIFE INSURANCE CO., | |
| | |
| Cross-defendant and Respondent. | |

BY THE COURT:

      The written opinion which was filed on November 16, 2017, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is therefore ordered that the opinion be published in the official reports.

 

_____
           Premo, Acting P.J.

 

_____
           Mihara, J.

 

_____
           Grover, J.

Trial Court:                           Santa Clara County Superior Court
                                       Superior Court No. 1-10-CV187143


Trial Judge:                           Hon. Patricia M. Lucas


Counsel for Plaintiffs and Appellants:    O'Connor and Associates
Nelson Choi,                              John D. O'Connor
Jeanne Choi                               Jeffrey D. Kirk
Choice Instruments, Inc.


Counsel for Defendants,                   Kaufman Dolowich & Voluck
Cross-complainants and Appellants:        Tad A. Devlin
Sagemark Consulting                       Gabriel Rubin
Lincoln Financial Advisors
Matthew Roberson
Richard Brown


Counsel for Cross-defendant and           Edison McDowell & Hetherington
Respondent                                Raymond J. Tittmann
American General Life Insurance Co.        Amy B. Boyea
                                          David T. McDowell
                                          Charan M. Higbee

Choi et al. v. Sagemark Consulting et al.

H041569